Per Curiam;:
This case was referred to the late Trial Commissioner Bobert K. McConnaughey with directions to make findings of fact and recommendation for conclusions of law. The commissioner did so in a report and opinion filed on August 18, 1965. Exceptions to the commissioner’s findings and recommended conclusions of law were filed by plaintiff, exceptions to the commissioner’s findings were filed by defendant, and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, not entitled to recover increased costs that resulted from delay in delivery of its worksites that occurred before July 21, 1953, but is entitled to recover increased costs that resulted from such delays that occurred after July 21, 1953. Judgment is entered accordingly with further proceedings suspended to allow the parties to return to the Armed Services Board of Contract Appeals for determination of the equitable adjustment to which plaintiff is entitled.
Commissioner McConnaughey’s opinion,* as modified by the court, is as follows:
The plaintiff, a New York corporation, has sued to recover increased costs allegedly incurred as a result of unreasonable delay by the defendant in making available two sites for performance of work required of the plaintiff under a contract for construction of 22 dormitories and 6 combination messhall and administration buildings at McGuire Air Force Base, New Jersey.[1]
The case is presented to the court on the record of the plaintiff’s appeal to the Armed Services Board of Contract Ap *973 peals[2] under a disputes clause in the contract.[3] No additional evidence has been taken by the court. The nature and amount of the damages claimed was not fully litigated before the board, and the parties have stipulated that this phase of the proceedings shall be limited to issues relating to the plaintiff’s right to recover.
The board made findings of fact and denied the plaintiff’s appeal in a decision dated February 11, 1959, which concludes with the statement-
We do not hold that appellant is not entitled to relief, but that it has failed to demonstrate that the relief which it seeks falls within the scope of the “Suspension of Work” provision of its contract.
The underlying facts are not substantially in dispute. As the controversy is presented by the plaintiff’s assignment of errors, it relates primarily to the correctness of the board’s conclusion that the defendant was not legally responsible for delays of as much as a year that admittedly occurred in making the plaintiff’s worksites fully available to it after the defendant had formally advised it of the urgency of the work and had given it notice to proceed within 15 days.
The plaintiff does, however, contest the correctness of various inferences drawn by the board and has requested that the court make numerous findings on the basis of its own review of the administrative record. Some of the requested findings amount, in effect, to requests for conclusions of law. Others would modify at least the emphasis, if not the substance, of some of the board’s findings of fact.
Although the evidence affords some basis for a reasonable difference of opinion about some of the facts (especially concerning the extent to which wet weather, early in 1953, prevented another contractor from grading the plaintiff’s main site, or merely made it inconvenient and more expensive), there is substantial evidence to support the board’s findings. They are summarized in this opinion and are regarded as establishing the facts on which the decision is based.
*974 The plaintiff’s contract was one of about 30 contracts awarded, late in 1952 and in 1953, to carry out a comprehensive plan for expansion of McGuire Air Force Base. The plan provided for building additional runways, taxiways, warehouses, combination messhall and administration buildings and dormitories, installing additional utility systems, and making other improvements, on approximately 1,200 acres of previously undeveloped land.
The plaintiff’s contract was dated December 29, 1952. It was the first of the building construction contracts awarded. In addition to the standard disputes clause for construction contracts, it contained the following articles pertinent to this dispute:
1. STATEMENT OF WORK. — * * * The work shall be commenced within fifteen (15) calendar days after the date of receipt by the contractor of written notice to proceed, and shall be completed not later than four hundred fifty (450) calendar days after the date of receipt by the contractor of said notice to proceed.
:fc s}: jJj sfc #
5. Termination for Default-Damages for Delay-Time Extensions. — * * *
$ $ $ ‡ #
(c) The right of the contractor to proceed shall not be terminated, * * * nor the contractor charged with liquidated or actual damages, * * * because of any delays in the completion of the work due to causes beyond his control without his fault or negligence, including, but not restricted to, * * *, acts of the Government, either in its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, * * * and unusually severe weather or delays of subcontractors due to such causes; Provided, That the contractor shall, within 10 days from the beginning of any such delay, unless the contracting officer shall grant a further period of time prior to the date of final settlement of the contract, notify the contracting officer in writing of the causes of delay. The contracting officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof. (Emphasis supplied.)
*975 12. Other Contracts. — The Government may undertake, or award other contracts for, additional work, and the contractor shall fully cooperate with such other contractors and Government employees and carefully fit his own work to such additional work as may be directed by the contracting officer. * * *
$ ‡ ‡
GC-11 SUSPENSION OE WONKA [4]— The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to ,be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the ease of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor, the contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the Contractor, provided, however, that the sus-gelision was not due to the fault or negligence of the ontractor. Provided, further, that no suspension will be ordered or adjustments made under this paragraph * * * as the result of any delays for which an extension of time may be granted under the Delays-Damage Article of this contract. (Emphasis supplied.)
Only two of the numerous other contractors were directly concerned with the events that led to the delay in the availability of the plaintiff’s worksites.
One of these, Yonkers Construction Company, whose contract was awarded November 29, 1952, was to clear, rough grade and drain the entire 1,200-acre site. The other, Ces-tone and Stamato, hereafter called Cestone, was to make necessary additions to the water distribution and sewage systems. Their part in the sequence of events that caused the delays will be elaborated hereafter.
The Yonkers’ contract was awarded on November 29, 1952, and Yonkers was notified to proceed on December 26, 1952 — 3 days before the plaintiff’s contract was awarded. Its work was to be completed in 240 days after notice to proceed.
*976 The Cestone contract was awarded on January 20, 1953, about a month, after the date of the plaintiff’s contract. It, too, was to complete its performance in 240 days after notice to proceed. Cestone was notified to proceed on February 18,1953, and promptly commenced its work on the plaintiff’s main site.
In addition to the installation of water and sewer lines, the Cestone contract provided for construction of a water tower on the plaintiff’s main site between the places where the plaintiff was to build two of the mess-administration buildings. It required that the water and sewage lines be brought only to within 5 feet of the building lines. It was impracticable for the construction of the buildings and the water and sewage installation to proceed simultaneously in the same area, but there is no finding, and no evidence, that Cestone’s installation of the water and sewage systems needed to precede construction of the buildings.
Initiation of work by the plaintiff was, however, dependent upon completion of the grading by Yonkers. As events transpired, this fact, and the fact that Cestone did not regard its work as dependent on completion of the grading, were at the root of most of the trouble of which the plaintiff complains.
On January 9, 1953, about 10 days after the plaintiff’s contract was awarded, the contracting officer wrote the plaintiff, suggesting a meeting to discuss the proposed construction. At that meeting, held J anuary 19, 1953, the day before the Cestone contract was awarded, the plaintiff was informed of the urgency of the construction and was told that the general plan called for making areas available to the building contractors in the order hi which their contracts were awarded.[5] The defendant’s spokesman at the *977 meeting said that “weather permitting,” the plaintiff’s main site would be graded out in about 8 weeks. The plaintiff itself had estimated that the grading of its main site would require from 4 to 6 weeks, and when Yonkers eventually got around to grading the main site, in June and July 1953, under good weather conditions, it took about 6 weeks to complete the work.
The contracting officer mailed a notice to proceed to the plaintiff on January 20, 1953, the day after the meeting. The plaintiff received it on January 23, 1953. Under the terms of the contract, it was then obligated to proceed within 15 days, and the 450-day construction period thereupon commenced to run.
Meanwhile, on January 20,1953, the plaintiff, anticipating the notice to proceed, started to move a shanty on to the main site, but was stopped by the resident engineer because he thought it would interfere with Yonkers’ grading operations.
That was the closest the plaintiff came to being able to commence work on either of its two sites, until June 22,1953, when the small site, on which it was to build two dormitories and one messhall, was made available,[6] and the plaintiff commenced work there.
The western half of the plaintiff’s main site, except for the part on which Cestone was to build the water tower, was made available to the plaintiff September 21, 1953. The plaintiff accepted the part that was then available and began some work there the same day, September 21.
Most of the balance of the main site — the eastern half— was not formally available to the plaintiff until January 11, 1954, although it did some excavation there late in 1953. On January 7,1954, the plaintiff agreed to accept the eastern *978 half, in the condition it was then, and on that same date, the resident engineer confirmed that agreement and said he had informed the plaintiff’s representative that the entire site would be available on January 11, 1954.
The part of the western half on which Cestone was to build the water tower was not delivered to the plaintiff until January 24,1954, and the plaintiff did not begin work on one of the buildings to be located there, until April 1954, or on the other, until July 1954. The record does not disclose the reason for the delay between January 1954 and April or July 1954.
Thus the two sites were made available to the plaintiff, piecemeal — the small site, June 22, 1958; a part of the western half of the main site September 21, 1953; a part of the eastern half sometime later in the fall of 1953; another part J anuary 11,1954, and the rest of the western half, where Cestone had been building the water tower, on J anuary 24, 1954 — a year and a day after the plaintiff received its notice to proceed.
On March 18,1954, the plaintiff accepted a 252-day extension of the time for completion of its work pursuant to the delay-damages clause {supra, p. 974).[7]
A number of factors contributed to the delayed, piecemeal delivery of the plaintiff’s worksites.
The board’s poetic finding that “the best laid schemes o’ mice an’ men Gang aft agley” is doubtless factual, consistent with common experience, and, insofar as it applies to this case, amply supported by substantial evidence and therefore conclusive. It does not, however, identify the causes for the disruption of the original plan for orderly administration of these contracts that occurred. Nor does it afford a basis for allocating legal responsibility for any financial detriment that disruption may have caused the plaintiff. To discover the reasons for the delays as a basis for determining responsibility for them requires analysis of the board’s findings in more detail.
*979 Yonkers did not complete the grading of the plaintiff’s main site until July 21,1953.[8]
Yonkers’ delay in completing the grading had its inception in excessive rainfall throughout the period from early November 1952 through May 1953, except during February, when there was less rainfall than normal.[9] The board found that, over all, it was the wettest spring season on record in New Jersey. Early in June, however, the weather changed abruptly, and June, July, August, and September were drier than normal, and abnormally hot.
There is no finding that the condition of the soil prevented the grading of the plaintiff’s sites. During the late winter and throughout the spring, the wet condition of the soil did, however, impede, if it did not preclude, the grading of the plaintiff’s main site in a manner which Yonkers considered economically practicable, and the combined efforts of the plaintiff and the defendant to induce Yonkers to grade the plaintiff’s sites before it ultimately did were unavailing.
As its part in the entire improvement plan, Yonkers was to cut, haul, place, and compact to specified densities, a total of about 5 million cubic yards of earth. Its contract provided for cutting down some areas and filling others in what is described as a “balanced cut and fill operation.” The grading plan required a cut of about 10 feet in the grade of the area where the plaintiff’s small site was located. The cut required on the plaintiff’s main site varied from 4% or 5 feet, in the northeast section, to zero, in the south and southwest sections. The quantity of soil to be moved on the plaintiff’s main site totaled about 130,000 cubic yards.
In January 1953, Yonkers found that much of the soil in the general area, not only in the vicinity of the plaintiff’s main site, but in other parts of the project as well, was too wet to compact properly.[10]
*980 On January 29,1953, Yonkers suggested to the contracting officer that it be authorized to excavate and spoil, or to stockpile, dry, and rehandle material that was too wet to compact properly, and proposed an increase in its contract price to reimburse it for this extra handling. The contracting officer refused the requested increase on February 24,1953.
Thereafter Yonkers refrained from doing the extra work required to grade areas where the soil was too wet to compact, if indeed it had ever made any serious effort to do so before. Instead it concentrated its efforts in areas where the soil was to be wasted because it was unsuitable for fill, or was sufficiently dry to compact properly when it was used as fill. Apparently Yonkers did not regard the soil on the plaintiff’s main site as meeting these qualifications, for it did little work there until June, after the excessive rains had stopped.
The plaintiff’s representatives, as well as the resident engineer, representing the defendant, repeatedly requested Yonkers to grade out the plaintiff’s main site. The resident engineer also suggested that ditches be cut to aid drainage of the plaintiff’s site. On one occasion, in a meeting on February 12, 1953, when it was suggested that Yonkers make road cuts and adjacent ditches so as to provide better drainage in the areas where it was having trouble, Yonkers refused because the proposed cuts would interfere with moving its equipment.
Another time, on April 6, 1953, Yonkers moved into the area of the plaintiff’s main site and started stripping top soil but made no attempt to cut ditches to assist drainage. The work was abandoned after 3 or 4 hours because of excessive moisture in the soil.
On April 16 the resident engineer again urged Yonkers to do something about temporary drainage in an area which included the plaintiff’s main site, and, on May 1, requested Yonkers to permit some of its earthmoving equipment to work in building areas where contracts had been let. Despite these requests, Yonkers’ equipment was not returned to the designated area until May 12. The reasons for Yonkers’ delay in compliance with the request are not apparent from the record.
*981 On May 28, ditching was completed along the low side of the plaintiff’s main site but, even then, heavy rains either prevented or limited stripping and grading.
After June 2, 1953, the rain stopped and the weather became warm. Yonkers finally went to work on the plaintiff’s main site about June 9, and completed the required grading there on July 21, 1953, except for mounds of earth around a line of utility poles across the eastern edge of the area that served the base communications center.
Thus, as far as the grading was concerned, most of the main site was ready for the plaintiff to commence its work on July 21,1953.
Even then, however, the plaintiff was not permitted to begin work there. Cestone had joined in the early complaints about the slowness of the grading. But Cestone was willing, and, in some limited measure, apparently was able to work in the area that composed the main site, despite the fact that it had not been graded.
On February 18, 1953, Cestone was notified to proceed, and sometime during February, began to work on the plaintiff’s main site, with the knowledge and consent of the resident engineer.
Cestone’s work there, throughout the spring, was intermittent and was performed in that part of the site where little or no cut was required. Cestone was not finished with its work on the plaintiff’s main site when Yonkers completed the grading there on July 21. Confronted with the impossibility of the plaintiff and Cestone working on the site at the same time, the defendant’s representatives authorized Cestone to continue with its installation of the water lines and sewers on the main site, thereby excluding the plaintiff from access to commence its work.
Cestone finally completed its work in the western half of the main site sometime in September.[11] The plaintiff began to do some work there September 21. How much it was able to do until the rest of the site was made available is not clear from the record.
*982 The board made no finding and the record does not show when Cestone completed the water and sewer lines in the eastern half of the main site. It does appear that, although the eastern half was not formally made available until January 11, 1954, the plaintiff did some excavation for utilities rooms of 1 out of 10 dormitories to be located there during the last 3 months of 1953 — 1 in October, 4 in November, and 2 in December.
The principal additional factor in delaying delivery of the eastern half of the main site consisted of the power lines that extended across the eastern end of the site on ground to be occupied by four of the dormitories. Sometime in December, Signal Corps personnel removed the power lines but left the poles and the mounds of earth supporting them for subsequent removal by another contractor. Apparently this was done late in December or early in January and the site was finally delivered to the plaintiff January 11, 1954.
From the foregoing summary of the events that delayed availability of various parts of the plaintiff’s worksites, it is apparent that the grading difficulties basically attributable to the wet weather that prevailed throughout the spring, were a directly effective cause of the delay only through July 21, 1953. It is also apparent that the wet weather did not physically prevent Yonkers from grading the plaintiff’s sites sooner than it did. The grading could have been done, but only at increased expense which neither Yonkers nor the defendant was willing to assume.
As regards the further delay in delivery of the worksites that occurred after July 21, 1953, when the grading was finished, the weather was no longer a directly significant factor. Except for the utility poles and the mounds of earth around them that would have impeded work on four of the dormitories, the area had been cleared and graded by July 21, 1953, and was in suitable condition for the plaintiff to do its work.
Such delays as occurred after July 21,1953, occurred primarily (a), because, in disregard of the priority promised the plaintiff by the contracting officer, his subordinate (the resident engineer), had made the plaintiff’s site available to Cestone, in February, for construction of the water tower and installation of the water lines and sewers, (b), because *983 Cestone, whose work on the plaintiff’s site during the spring was intermittent, had not completed its job by the time the grading was finished, and (c), because the defendant then authorized Cestone to continue working on the site until it did finish and thereby precluded the plaintiff from commencing its work.
The board found that, after the award of the plaintiff’s contract and before the issuance of its notice to proceed, the contracting officer advised the plaintiff that the construction was urgent, and described the defendant’s plan for coordinated performance of the complex construction project by many contractors.
According to the plan, as it was then represented to the plaintiff, the work areas would be made available to the building contractors in the order in which the contracts were awarded; the plaintiff, as the first of the building contractors, would have its sites made available first, and its main site would be graded out in about 3 weeks, weather permitting.
This instruction to the plaintiff by the defendant’s representatives, given promptly after the contract became effective, was an authoritative direction to the plaintiff concerning its general responsibility with respect to the planning and timing of its performance in accordance with clause 12 of the contract, which required it to cooperate with the defendant and the other contracting officers. The plaintiff was entitled to rely upon the representations then made to it concerning the actions the defendant proposed to take, or to require of other contractors (most significantly Yonkers), which were necessary to make possible the plaintiff’s performance in accordance with those instructions.
The board’s ultimate finding of fact, on which, primarily, it based its decision that the plaintiff was not entitled to any adjustment in its contract price because of the delays that ensued in the availability of its working sites, is the summary statement that-
* * * The plan could not be carried out because of conditions beyond the control of both the [defendant] and the contractors, i.e., a saturated soil and adverse weather. The plan had to be, and was, revised. * * *
There is sufficient evidence that the wet weather created serious problems in connection with the grading operation *984 to justify the conclusion that the literal substance of this finding, phrased as it is, is sustained by substantial evidence. Because of the wet weather the original plan, pursuant to which the plaintiff was told on January 19,1953, that, weather permitting, its site would be graded out within 3 weeks, and was notified on January 20, 1953, to proceed within 15 days, obviously had to be revised, if, indeed, it was ever altogether practicable in all its details.
But a finding merely that the plan had to be revised, although conclusive as far as it goes, is not a finding that because of the wet weather it had to be revised to the drastic extent and in all of the ways this plan was revised. The board’s findings as a whole make it quite clear that the saturated soil was not responsible for all the changes in the coordinate administration of the various contracts that contributed to the full year’s delay in the complete availability of the plaintiff’s worksites.
Nor is such a finding conclusive of questions of law concerning the extent to which the revisions that exceeded those made necessary by the adverse weather conditions could be made without adjusting the plaintiff’s price to cover added costs it incurred because of consequent unreasonable delays in the availability of its worksites.
Such part of the delay as was caused by revisions in the defendant’s program that were not required by the wet weather but were motivated primarily by financial or operational convenience of the defendant, or of other contractors operating under its general direction, are beyond the scope of the board’s finding that the plan had to be revised because of conditions beyond the control of the defendant and the contractors.
The extent to which such delays may amount to a constructive suspension of the work under the contract for an unreasonable length of time, and so invoke the mandatory obligation explicit in the suspension of work clause to make equitable adjustments for additional costs imposed on contractors by unreasonable delays, depends in large measure on the extent to which, in the circumstances evident from the findings, the plaintiff reasonably might have anticipated the revisions that occurred and assumed the risk of the de *985 lays such revisions might reasonably be expected to canse.
.There is no finding, and no evidence that any of the delays that occurred in this case were due to the fault or negligence of the plaintiff.
The board was correct in holding that the fact that the contracting officer did not formally issue a suspension of work order is not necessarily fatal to the plaintiff’s case— that if the facts establish a duty to issue such an order, relief could be granted as if such an order had been issued.[12] Cf. T. C. Bateson Constr. Co. v. United States, 162 Ct. Cl. 145, 319 F. 2d 135 (1963); Consolidated Constructors, Inc. v. United States, 162 Ct. Cl. 188 (1963); Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F. 2d 173 (1963).
The board was also correct in holding that, if the facts should warrant an adjustment in price under the suspension of work clause in recognition of any de facto suspension that occurred, the granting of such an adjustment would not be precluded by the proviso in the last sentence of the suspension of work clause, and the fact that the plaintiff was granted, and accepted, an extension of time under the delays-damages clause. See Karno-Smith Co. v. United States, 84 Ct. Cl. 110 (1936); Selden Breck Constr. Co. v. Regents of University of Michigan, 274 Fed. 982 (E.D. Mich. 1921).
Moreover the board was correct in rejecting the plaintiff’s contention that, by including the suspension of work clause in the contract, the defendant either assumed all risks incident to delays encountered on the project that were not due to the plaintiff’s fault or negligence, or imposed on the contracting officer a duty to issue a suspension of work order to cover all such delays.[13] Ozark Dam Constructors v. United States, 153 Ct. Cl. 120, 288 F. 2d 913 (1961); Flip *986 pin Materials Co. v. United States, 160 Ct. Cl. 357, 312 F. 2d 408 (1963).
The board summarized the principles it sought to apply by stating that the effect of the suspension of work clause was-
* * * to provide a contractual basis for compensating á contractor for delays caused by the Government in its contractual capacity, which, because they unreasonably delayed the progress of the work, resulted hi additional expenses and losses not reasonably anticipated by the contractor at the time it entered into the contract, and the risk of which it had not assumed.
Stated in the alternative terms used by the board, the principle it sought to follow is:
That the suspension of work clause-
* * * is designed to permit a contracting officer to issue a suspension of work order when he finds it necessary for the convenience of the Government to interrupt or delay a contractor’s work in a matter or manner not otherwise authorized in the contract * * * and, if the resulting interruption or delay is for an unreasonable length of time causing additional expense or loss to a contractor, without fault on his part, to make him whole through appropriate adjustments in time for performance and in contract price. * * *
These are correct summary statements of the basic principles governing the application of the suspension of work clause to the facts of this case.
The troubles with the board’s application of these rules in its decision are:
1. The board’s failure to attribute legal significance to the fact, evident from its findings, that to a substantial extent the delay in the plaintiff’s access to the areas where it was to do its work was not necessitated by saturated soil or adverse weather, but was the direct result of the defendant’s choice of courses of action which its representatives considered more advantageous or convenient to the defendant than others that could have been taken.
2. The board’s violent assumption that, whereas the defendant was not at fault in failing to foresee the conditions that developed, the plaintiff, with wholly disparate prescience, knew and assumed not only (a) the *987 risk that the grading of its worksites by another contractor might be delayed as a result of the excessive rain that was already prevalent when its contract was awarded, when it received its instructions concerning the timing of commencement of its performance, and when it received its notice to proceed, but also (b) the risk that the defendant’s representatives would wholly disregard their repeated representations to the plaintiff that it would have priority of access to its worksites as soon as they were graded.
It is clear from the findings that the defendant’s original estimate on January 19, 1953, that it would take 3 weeks to grade the plaintiff’s main site, would have been optimistic by about 100 percent, even if the wet weather had not resumed after February and continued until the end of May. Despite the defendant’s estimate, the plaintiff itself believed that the grading would take from 4 to 6 weeks, even in good weather. Plainly the plaintiff did not expect that the grading could be completed, or that the site would be available, until after the end of February, which, as it turned out, was the only relatively dry interval between the rains.
Taking account of the rainy weather that had prevailed throughout December and January, and the normal risks of delay from excessive rain or other adverse conditions during the remainder of the winter and in the spring, it is plainly not unreasonable to conclude that the plaintiff anticipated, and assumed, the risk that its sites could not be available, even under good conditions, before early March, at the earliest — 6 weeks after it received its notice to proceed — and that they probably would not be available before the end of a sufficient period thereafter to accommodate a reasonable amount of difficulty with wet soil or other normal operating hazards.
As the findings plainly show, Yonkers did little work on the plaintiff’s sites, either before or during February, or for some months thereafter. There is no finding that the grading of the plaintiff’s site could not have been accomplished, physically, sooner than it was, if either Yonkers or the defendant had been willing to assume extra costs that would have been incurred in handling the wet soil excavated from the plaintiff’s sites.
*988 During most of the spring, some of the soil was too wet to compact properly if used as fill, and some of it, including the wet topsoil, would have had to be wasted or stockpiled anyway because the areas to which it was to be moved were not yet ready to receive it.
To some extent, the delay in finishing the grading was attributable also to Yonkers’ unwillingness to incur such inconvenience in moving its equipment as would have resulted from the construction of ditches that might have drained the area sufficiently to have permitted the grading to be done sooner than it was without special handling of the wet earth.
It is evident from the findings that Yonkers’ reasons for not grading out the plaintiff’s site sooner than it did were based primarily on cost and operational convenience, as those factors were affected by the wet weather, and not on any absolute physical impossibility of performing the work.
It is also clear that the defendant, as well as Yonkers, was unwilling to assume such added costs as would; have resulted from grading the plaintiff’s sites when the soil was excessively wet. Moreover, the findings show that either the defendant lacked authority under its contract with Yonkers to require Yonkers to give priority to grading of the plaintiff’s sites, regardless of cost or inconvenience, or the defendant’s representatives were unable or unwilling to exercise effectively such authority as they had to do so.
Considered as a whole, however, these delays in completing the grading have their basis directly in the adverse weather. There is no clear ground in the findings or the evidence for concluding that the plaintiff had any right or reason to expect that, if excessive rain or wet soil made the grading of its sites a costly special operation, as it did, either the defendant or Yonkers would assume substantial extra costs to grade its sites ahead of other parts of Yonkers’ job that could be done at relatively less cost and inconvenience under the conditions that prevailed.
Evidently Yonkers got to the grading of the plaintiff’s main site within a week after the rains stopped and the ground began to dry out. Once it started, it completed the grading within the maximum time the plaintiff’s representatives had originally estimated it could be done in good weather.
*989 On the whole record there is no adequate basis for concluding that the delays that occurred in the grading of the plaintiff’s sites may be regarded as unreasonable within the meaning of the suspension of work clause of the contract.
Accordingly, the plaintiff is not entitled to any adjustment for costs attributable to the delays that occurred before July 21,1953.
The delays that occurred thereafter require a different conclusion.
The plaintiff had been told by the defendant’s representatives, in mid-January 1953, that its construction of the buildings was urgent. It had been told then that its work-sites would be available to it first, among the contractors, as soon as the areas could be graded. Night on the heels of these representations, it had been given a notice to proceed. Negardless of whether these representations were enforceable contractual obligations of the defendant,[14] they were representations made by accredited representatives of the defendant under authority established or specifically acknowledged in the contract. The plaintiff was entitled to rely upon them as the basis for whatever arrangements it needed to make to enable it to perform its obligations under the contract.
Thereafter, during February, before the time the main site could have been graded out under the best of conditions, the resident engineer arranged for Cestone to begin work on the plaintiff’s main site. Cestone had not completed its work there when the grading was finished in July. Instead of letting the plaintiff begin work then, the defendant’s representatives allowed Cestone to continue to preempt the site until it had finished its work. Some it finished in September; some at a time, later in the fall, that is not clearly identified; some early in January 1954; and some toward the end of January of 1954.
The findings afford no factual basis for the board’s conclusion that the plaintiff should have anticipated, and assumed the risk, that for almost a year, the defendant’s repre *990 sentatives would give Cestone priority of access to the work-sites which they had represented would be available to the plaintiff as soon as they were graded.
Cestone’s contract was not even in effect when the representations were made, although it became effective the next day, and it is not improbable that the plaintiff was informed there would be such a contract.
As the board said, there was no contractual promise that bound the defendant to accord the plaintiff priority of access to the main site over Cestone. Moreover the plaintiff was obligated under clause 12 of its contract to cooperate with other contractors and the defendant’s representatives, and fit its own work to such additional work as the contracting officer might direct.
But the plaintiff’s right to a price adjustment under the suspension of work clause does not depend on a breach of the contract by the defendant. The issue is whether the defendant, for its own advantage and convenience in administering the project, has taken action which delayed the plaintiff’s access to its worksites for an unreasonable length of time and thereby caused the plaintiff additional expense not due to the plaintiff’s fault or negligence. If it has, the suspension of work clause directs that the contracting officer shall make an equitable adjustment in the contract price. See T. C. Bateson Constr. Co. v. United States, supra; Cannon Constr. Co. v. United States, supra, 162 Ct. Cl. at 105, 319 F. 2d at 179.
Doubtless the resident engineer considered it necessary or desirable for the convenience of the defendant to have Ces-tone commence its work on the plaintiff’s main site in February, before the site was graded, and, in July, after the grading was finished, to continue to preempt the site from the plaintiff until the utility installations were finished. He had authority to coordinate the contracts and direct the order of their performance. The arrangement he directed, whereby Cestone proceeded first, ahead of the plaintiff, and continued with exclusive access to the site until its work was finished, was no breach of the contract on the part of the defendant. It was, however, an act done solely for the defendant’s convenience, and it delayed the plaintiff’s performance of its work unreasonably beyond the time when the *991 plaintiff had every reason to expect, on the basis of the defendant’s representations, that it would be able to commence. This is precisely the kind of situation in which the suspension of work clause requires that the contract price be adjusted to cover added costs imposed on the contractor by the delay.
Whatever obligation the plaintiff may have had under clause 12 to cooperate, and to fit its work to such additional work as might be directed by the contracting officer, plainly did not require it to stand aside for almost a year after it had been directed to proceed, had been induced by the defendant’s representations to believe that it would be enabled to proceed, and, in reliance on those representations, had made preparations to begin its work — without recompense under the suspension of work clause for such added costs as it incurred in making such preparations and standing ready to perform its obligations.
For these reasons the plaintiff is entitled to recover such additional expense or loss as it may be able to show to have been caused by delay in the defendant’s delivery of its work-sites beyond July 21,1953, including any such expense or loss it may be able to show to have been caused by the defendant’s failure to remove the power lines on the eastern end of the main site.
The defendant’s maintenance of the power lines in place until December 1953 and the consequent exclusion of the plaintiff from work on the buildings in the area they traversed, were obviously for the defendant’s advantage and convenience. To such extent as the plaintiff can show that the defendant’s failure to remove them at an earlier time caused it expense that it would not have had otherwise, it is entitled to recover the amount of such expense.
CONCLUSION 03? LAW
For the reasons stated in the foregoing opinion, which includes therein the findings of fact made by the court as a part of its judgment herein, the court concludes, as a matter of law, that the plaintiff is not entitled to recover increased costs that resulted from delay in delivery of its worksites that occurred before July 21,1953, but is entitled to recover increased costs that resulted from such delays that occurred *992 after July 21, 1953. Judgment is entered accordingly. Further proceedings will be suspended to allow the parties to return to the Armed Services Board of Contract Appeals for determination of the equitable adjustment to which plaintiff is entitled.

The opinion, findings of fact and recommended conclusion of law were submitted under the order of reference and Rule 57 (a). Such, facts as are necessary to the decision of the case are found in tie c ommissioner’s opinion.

 Twenty-five of the buildings were to be built on a 32.4-acre site, hereafter called the plaintiff’s main site, and the other three on 2.5 acres, hereafter called the small site.

 ASBCA No. 4403 (February 11, 1959).

 Prior decisions by the contracting officer and tbe Corps of Engineers Claims and Appeals Board (C & A No. 968, April 30, 1957) had denied the plaintiff’s claims for an equitable price adjustment asserted under a suspension of work clause included as paragraph GC-11 of the contract.

 Specifications, p. II-5.

 At a previous meeting between Yonkers and tbe defendant’s representatives, reported in a memorandum dated December 31, 1952 — 2 days after tbe award of tbe plaintiff’s contract, Yonkers bad been informed- that tbe general priority of areas would be in the order in which contracts were awarded, and Yonkers agreed to turn over particular areas in tbe order desired by the defendant so that other contractors could proceed with their work.
According to the memorandum-
“* * * It was agreed that when a particular building area was brought to grade, the Government would check it out and would give the receiving contractor an opportunity to state whether he had any objections to the site as presented and if all work was found acceptable, it would be taken over from Yonkers and they would be relieved of all future maintenance thereon.”

Xonkers Rad begun clearing and grubbing the area, •which, included the plaintiff’s small site, in late December. On February 3, 1953, it began grading the area, and on June 8, 1953, the resident engineer advised the plaintiff that the small site was available for construction of the two dormitories and the mess-administration building that were to be built there. The plaintiff was reluctant to undertake the work on a piecemeal basis, but was persuaded by the resident engineer to begin on the small site. By a letter dated June 16th, the plaintiff acknowledged receipt of the notice of availability and said, among other things, that it would start construction on the small site on June 22nd, and would require a further extension of time by reason of the nondelivery of the main site. The plaintiff occupied the small site on June 22, 1953, and installed its sawmill there rather than on the main site as it had planned.

 Although 353 days had elapsed from the date of acknowledgment of the notice to proceed, the plaintiff accepted the 252-day extension, in view of the work already accomplished on the small site and on parts of the main

As indicated above (note 6, supra), it completed grading the small site on or before June 8, 1953.

The rainfall in November and December 1952 and January 1953 exceeded the normal rainfall by 56 percent, 59 percent, and 22 percent. In March, April, and May 1953, it was 83 percent, 69 percent, and 104 percent above normal. February was 7 percent below normal.

 At that time, Yonkers told the plaintiff it would be about 2 months before the grading of its site could be completed. On the basis of that advice, the plaintiff requested a 2-month extension and stated that an additional extension would be required if the grading were not completed within that time.

 At that time, Cestone still had not finished building the water tower which it had commenced in July on the western half of the main site. The water tower was not finished until January 23, 1954, and meanwhile the plaintiff was precluded from working on the two buildings in its immediate area.

 The board relied upon its own precedents : Guerin Brothers, BCA No. 1551 (1948); J. A. McNeil Co., ASBCA No. 1156 (1952); Townsco Constr. Co., ASBCA No. 1169 (1953); Scott-Buttner Electric Co., ASBCA No. 1916 (1954); Allied Contractors, Inc., ASBCA No. 2593 (1955); Jack Clark, ASBCA No. 3672 (1957); Chris Berg, Inc., ASBCA No. 3466 (1958), and others.

 I n support of its conclusion on this point, the board relied upon the following administrative decisions: Guerin Brothers, supra, note 12; J. A. McNeil Co., supra, note 12; Townsco Constr. Co., supra, note 12; Scott-Buttner Electric Co., supra, note 12; Chris Berg, Inc., supra, note 12; and Basich Brothers Constr. Co., BCA No. 1592 (1949).

 The ASBCA found that the government gave no “promise”, but it also found that the representations were in fact made that plaintiff’s main site should be graded out in about three weeks from January 19, 1953, weather permitting.