## C. H. LEAVELL AND COMPANY

### v.

### The UNITED STATES.

### No. 91–74.

United States Court of Claims.

Jan. 28, 1976.

William J. Derrick, El Paso, Tex., attorney of record for plaintiff. Kemp, Smith, White, Duncan & Hammond, El Paso, Tex., of counsel.

Edward J. Friedlander, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Charles M. Reifel, Washington, D.C., for Associated General Contractors of America, amicus curiae. Hudson, Creyke, Keohler, Brown & Tacke, Washington, D.C., of counsel.

Before DURFEE, Senior District Judge, and NICHOLS and KASHIWA, Judges.

PER CURIAM:

This case comes before the court on plaintiff's and defendant's requests filed July 7, and 10, 1975, for review by the court of the recommended decision filed on May 13, 1975, by Trial Judge Lloyd Fletcher, pursuant to Rule 166(c), and the parties' responses thereto. He reviewed and would reverse a decision of the Corps of Engineers BCA No. 3082, 73–2 BCA ¶ 10,349. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. We have also had the benefit of amicus briefing and oral argument by the Association of General Contractors. Upon consideration thereof, since the court agrees with the said recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case.

■ The Army Engineers awarded plaintiff a long-term construction contract without having appropriated funds available for obligation in the full contract amount, as they are authorized to do by 33 U.S.C. Sec. 621. As the result of an appropriation curtailment in a later year, funds were exhausted and work had to be suspended from January 14 to June 16, 1969. Plaintiff claims an equitable adjustment for its added cost, pursuant to the "Suspension of Work" clause, GP–42, a standard provision. Defendant denied and here denies liability because of the "Funds Available" clause SP–19, which is also standard in Army Engineers contracts of a continuing nature. We agree with plaintiff, the Association of General Contractors, and the trial judge, that an equitable adjustment is available under GP–42 for an unreasonable suspension even though the cause is an appropriation cut-off, whose possibility the parties contemplate and whose consequences they deal with under SP–19. This conclusion obtains even

though defendant's officers acted reasonably, as the trial judge held they did, in allocating the restricted funds available between plaintiff's contract and other claimants against the same appropriation item. Plaintiff, in requesting review, urges they acted unreasonably, an issue we find unnecessary to reach in the circumstances.

The Board reasoned that plaintiff did not incur its loss without its own "fault or negligence" and therefore the Suspension of Work Clause by its own stated limitations does not apply. The Board considered that plaintiff followed an "accelerated schedule" in spite of full knowledge it would exhaust the funds available for contractual progress payments, on which it relied for working capital to keep the work going. It properly should have decelerated, says the Board. Actually, at the time of suspension, plaintiff was behind a progress schedule defendant had agreed to, subject only to fund availability. Defendant repeatedly had given notice that funds were about to run out and just as repeatedly, until the final occasion, it found more money somewhere. There is no evidence these notices were intended to give plaintiff a factual basis for planning a decelerated work schedule, nor were they in any way helpful for that purpose. Plaintiff gave notice in its letter of July 23, 1968, that it was unable to plan a deceleration. The Board finds the schedule plaintiff tried to adhere to would, if uninterrupted, have produced "optimum profits," an inverse way of finding that a decelerated schedule would have been more costly. The "Funds Available" clause reads to assure a contractor of an extension of time in case of an entire work stoppage due to exhaustion of funds, but says nothing as to a deceleration made by the contractor *sua sponte* because of his anticipation that funds would run out. If a contractor voluntarily decelerated, and then the Engineers found still another untapped financial resource, *quaere* whether any extension would have been available against the substantial liquidated damages the contract called for.

A construction contractor, such as the plaintiff, may be knowledgeable about the Engineers' financing, but is hardly likely to be as much so as the Engineers themselves. If they in their best judgment think a deceleration of work will make the consequences of an anticipated stringency of funds less painful than a later total stoppage, they have ample authority to order one under the Changes and Suspension of Work Clauses, either or both. We think it wholly arbitrary and capricious to accuse a contractor of "fault or negligence" because it does not initiate a decelerated schedule on its own, without orders. The most it might be expected to do is recommend or request deceleration orders, if it sees clearly that deceleration will be more economical than complete stoppage for a shorter period. No such possibility is shown here. By the standards of the Wunderlich Act, 41 U.S.C. Secs. 321, 322, the position of the Board cannot be sustained.

Nothing we say should be read as holding that an unordered deceleration is not a constructive partial suspension of work if made under pressure of compelling circumstances for which defendant is responsible. We are not here considering whether plaintiff would have had a claim for partial suspension of work under GP–42 if it had decelerated as the Board says it should have done. *Cf. Merritt-Chapman & Scott Corp. v. United States*, 429 F.2d 431, 192 Ct.Cl. 848 (1970).

Therefore, judgment is entered for plaintiff and the cause is remanded to the Board, under Rule 149, for proceedings to ascertain the quantum of equitable adjustment to which plaintiff is entitled. Further proceedings in this court are stayed for six months. Counsel for plaintiff is designated to advise the court of the status of proceedings as required by Rule 149(f).

The opinion and conclusion of law of the trial judge follow:

FLETCHER, *Trial Judge*: In this contract case the court is called upon for the first time to explore the interrelationship between two standard Govern-

ment contract provisions which are included most frequently in so-called "continuing contracts". The two clauses are generally referred to as "Funds Available for Payments" (hereinafter frequently called the "funds available clause"), and "Price Adjustment for Suspension, Delays, or Interruption of Work" (hereinafter frequently called the "suspension of work clause").[1] The objective facts do not appear to be in significant dispute although the parties vary widely in their interpretation and application of those facts to the problem at hand.

The contract involved is a unit-price "continuing contract" which the Army Corps of Engineers awarded to plaintiff C. H. Leavell and Company (Leavell) on May 5, 1967. It called for the construction of the Jonesville Lock and Dam on the Black River in Catahoula Parish, Louisiana, for the sum of nearly $15 million. This construction was part of an overall navigation project authorized by Congress in the River and Harbor Act of 1960 for the improvement of the Ouachita and Black Rivers in Arkansas and Louisiana. The work was to be completed within 1,100 days, or approximately three years, from receipt of notice to proceed, and the contractor was subject to liquidated damages of $600 for each day of unexcused delay beyond the completion date. The contract provided for monthly progress payments to be made on estimates approved by the Contracting Officer, less a 10 percent retention by the Government until completion and acceptance of the work. A Notice to Proceed was received by Leavell on June 15, 1967, which fixed the completion date at June 17, 1970. Meanwhile, as a result of several contract modifications, the estimated contract price was increased to $15,029,782.31, with the completion date being slightly extended to June 19, 1970.

On June 23, 1967, Leavell had submitted a progress chart, as required by the contract, showing a completion date in December 1969, which was approximately two and one-half years after re-

ceipt of the Notice to Proceed. This progress chart, however, was rejected by the Corps of Engineers and was returned to Leavell with instructions that it be changed to reflect a progress curve through the scheduled completion date of June 19, 1970. Leavell revised and resubmitted the progress chart on July 20, 1967, in which the progress curve was duly extended through the completion date but continued to show a 96 percent completion within two years as had been shown in the original chart. This revised work schedule was approved by the Corps on August 14, 1967, "subject to the availability of funds as mentioned in SP–19 of the contract."

After encountering some delay in its concrete pile driving operations, Leavell submitted to the Corps in February 1968 a further revision of its program schedule. In this revision, the program curve was reshaped so as to show an 89 percent completion in two years with earnings at the end of fiscal year 1969 of about $13,350,000. According to Leavell's Project Manager, no action was taken by the Contracting Officer by way of either approving or disapproving this later revision.

The invitation for bids on the Jonesville Lock and Dam contract specified that only $25,000 was then available. At the time of the award to Leavell, however, this sum had been increased to $75,000, and Leavell was advised to that effect. Thereafter, funds for the contract were increased on July 10, 1967, to $2,915,000, and were later increased on January 22, 1968, to $3,496,900. On March 13, 1968, however, the Contracting Officer wrote Leavell as follows:

A review of your construction progress indicates that the funds available for expenditure under this contract will be exhausted about 15 April 1968. Therefore, in accordance with the provisions of paragraph SP–19e of the contract specifications, this is your notice that funds available are only

---

1. These two standard provisions, as included in the contract here involved, are known in Government contract shorthand nomenclature as SP–19 and GP–42, respectively. Inclusion of both is mandatory in Army Corps of Engineers continuing contracts. They are reproduced in full below as Appendix A hereto.

sufficient to pay for your estimated earning through about that date and work may be suspended when funds are exhausted.

At your option, and as provided in paragraph SP–19e, you may continue work under this contract after funds are exhausted, as we have sufficient funds for inspection and supervision through 30 June 1968. However, no payments will be made for such work unless additional funds become available. When funds again become available, we will notify you promptly.

Should work be thus suspended, additional time for completion will be allowed equal to the period during which work is necessarily so suspended, as provided in paragraph SP–19e.

Nonetheless, on March 21, 1968, and March 28, 1968, funds were increased for a total of $500,000, on which occasions the Contracting Officer advised Leavell that he had anticipated the receipt of such additional funds even at the time he had issued the above-quoted notice of deficiency. Thereafter, the same procedure was followed and by June 29, 1968, funds had been increased to $4,733,300.

Then, on July 9, 1968, at which point Leavell had completed about 39 percent of the job, the Contracting Officer wrote Leavell as follows:

I have increased funds to $6,083,300.00 for the payment of estimates of work * * * for construction of Jonesville Lock and Dam.

The additional funds provided herein should not be construed as the total that will be made available in FY 1969. The President's FY 1969 Budget contained $5,656,000 for this contract and the House passed FY 1969 Appropriation Bill for FY 1969 contained $4,712,000.00. However, because of the pending cut in FY 1969 Federal Expenditures, the full amount available for the year will not be known until final appropriations are made.

During the preceding month, the Revenue and Expenditure Control Act of 1968 had been enacted, and Leavell's president realized that this Act, which contained a ceiling on Government ex-

penditures for 1969 of $6 billion below the budget sent to Congress on January 29, 1968, might have an impact on the funding of the project. In implementation of the Act, the Bureau of the Budget established expenditure ceilings for individual agencies and required each agency to prepare and maintain a financial plan with a view to controlling Government obligations so as to permit effective adherence to the expenditure ceiling thus imposed.

At this time, Leavell considered slowing down the work. However, upon considering the possibility that any such deceleration might cause it to exceed the completion date and hence become liable for liquidated damages at the rate of $600 a day, Leavell decided to proceed with the work in accordance with the planned rate of progress. On July 23, 1968, Leavell's project manager wrote the following letter to the Contracting Officer:

We are in receipt of your letter dated 9 July regarding the above subject, and are considerably dismayed at its contents, although it is our understanding that the amounts set forth therein may yet be final.

We have made a thorough review of our proposed progress for the current fiscal year and a conservative evaluation indicates that we will perform work amounting to approximately $6.5 million between now and 30 June 1969. Further during this progress review, we were unable to practically design a rate of progress commensurate with the funds which you indicated will be available.

The situation appears very serious to this company and we would appreciate your thinking and any further information which you may be able to furnish.

In response to the above letter, the Contracting Officer advised Leavell that he could not comment on the adequacy of funds to meet the progress schedule until the FY 1969 Appropriation Bill was passed.

The FY 1969 Civil Work Appropriation Act was enacted in August 1968. The

Bureau of the Budget, however, had as yet not implemented the Revenue and Expenditure Control Act. It was not until some time in September 1968 that the Corps received a spending ceiling for FY 1969 expenditures from the Bureau of the Budget, and it was not until October 1968 that the Corps-proposed plan of meeting its ceiling was approved by the Bureau of the Budget.

By letter dated September 6, 1968, the Contracting Officer increased the allocation of funds to plaintiff's contract to a total of $7,483,300. On September 25, 1968, the Contracting Officer by letter again increased the funds allocated to Leavell's contract to a total amount of $9,233,000. No additional funds were thereafter obligated against plaintiff's contract until June 1969 when the allocation of funds to the contract was increased by $715,000.

On November 29, 1968, the Contracting Officer, pursuant to the "Funds Available for Payment" clause, notified Leavell as follows:

Review of your construction progress indicates that the funds available for expenditure under this contract will be exhausted about 31 December 1968. Therefore, in accordance with the provisions of paragraph SP–19 of the contract specifications, this is your notice that funds available are only sufficient to pay for your estimated earnings through about that date and work may be suspended when funds are exhausted.

At your option, and as provided in paragraph SP–19e, you may continue work under this contract after funds are exhausted, as we have sufficient funds for inspection and supervision through 30 June 1969. However, no payments will be made for such work unless additional funds become available. When funds again become available, we will notify you promptly.

Should work be thus suspended, additional time for completion will be allowed equal to the period during which work is necessarily so suspended, as provided in paragraph SP–19e.

By letter dated December 14, 1968, Leavell advised the Government that:

* * * upon exhaustion of funds presently available to us shortly after 1 January 1969, C. H. Leavell & Company will suspend all operations on the Jonesville Lock and Dam project.

Be further advised that we intend to claim for all costs incurred as a result of this suspension of work, under the applicable articles of the contract * * *

Work was in fact suspended by Leavell on January 10, 1969. At that time the work was about 58 percent completed and the sum of $9,233,300 had been obligated against the contract.

In response to a request by Leavell on January 14, the Contracting Officer wrote a letter to Leavell in which he reviewed the various budgetary factors and expenditure restrictions under which the Corps of Engineers was operating during FY 1969. He reminded Leavell that under the terms of its contract there was no "absolute guarantee that funds will be made available in the future to continue the project," but at the same time, observed that it was the history of such projects for Congress to provide appropriate funds for continuation of projects in such an advanced state of completion. He concluded the letter with the rather superfluous statement:

Consequently, my position is that expressed in my letter of 29 November 1968, advising you of the exhaustion of funds and as further expressed in paragraph SP–19 of your contract, referred to in that letter. '

During the shutdown period, considerable materials and equipment had been delivered to the project site, and on May 27, 1969, the Government advised Leavell that approximately $800,000 would be available at July 1, 1969 to pay for previously delivered materials and equipment. Leavell responded that material and equipment worth approximately $640,000 would be delivered to the site prior to June 20 for which it would expect payment no later than July 1 and

that it was not in any way relinquishing its claim for suspension of the work.

On June 5, 1969, the Contracting Officer advised Leavell that additional funds in the amount of $715,000 would be obligated to the contract on or about June 11, and that this would enable Leavell to resume construction work. Leavell responded that it would recommence work on June 16, 1969. From all that appears, the work was thereupon resumed and carried to completion without further dispute.

Before the Corps of Engineers Board of Contract Appeals, Leavell claimed that it was entitled to an equitable adjustment under the suspension of work clause because the Government's failure to provide sufficient funds forced a shutdown of Leavell's operations from January 10 to until about July 1, 1969. The Government argued that Leavell had elected to suspend operations during that period, as it had the right to do under the funds available clause, when appropriated funds available for work under the contract were exhausted, and relied upon that part of the clause providing that the Government would not be liable for damages on account of delay in payments due to lack of available funds. The Government further contended that Leavell on its own volition accelerated its rate of progress, and in so doing took the risk that additional funds might not be provided to meet such accelerated progress schedule. Leavell responds that while the funds available clause (SP–19) may preclude any claim for common law damages for breach of contract, it does not bar an equitable adjustment under the suspension of work clause (GP–42), when work is suspended for an unreasonable length of time due to lack of funds.

The Board decided the case adversely to Leavell, stating in part:

> It is the opinion of this Board that the Corps of Engineers acted reasonably in the allocation of funds available to it during the life of this contract and did not unfairly burden this contract for the benefit of others. Priorities were established on the basis of rational decisions and funds were allocated accordingly.

> * * * * * *

> For this contract the Corps of Engineers was able to provide approximately $9.2 million during the first 1½ years of work on a contract which was to run 3 years and cost approximately $15 million. Appellant used all of the $9.2 million in completing approximately 58% of the work during the first 1½ years. Another $715,000 was provided at the end of the second year for a total of approximately $10.0 million, which is about two-thirds of the total contract price.

> * * * * * *

> Despite * * * knowledge of funding difficulties and in contrast to the actions of the Corps of Engineers, appellant did nothing to alleviate the situation created by the shortage of funds. On the contrary, it compounded that situation by adhering to a schedule which would produce optimum profits—one which contemplated pushing the job hard during the first two years and substantial completion of all work approximately six months in advance of the contract completion date. This was a conscious business decision made by appellant after careful consideration of the risks involved and was prompted in part by appellant's experience on previous Corps of Engineers projects, funded as this one was, where the Corps of Engineers had always before been able to provide all the funds necessary to meet appellant's requirements.

> This time appellant made the wrong decision. The Corps of Engineers was unable to provide funds as fast as appellant could generate demands for funds. But it is our judgment that the flow of funds to this contract was not so small or so slow that the work could not have been accomplished at a reasonable pace and with only those delays in payment contemplated by SP–19 if appellant had been willing to cooperate and accept those delays.
> * * *

It was appellant's decision not to modify the pace of its work operations and not to accept delays in payment. We believe that this decision resulted in a conversion of the payment delays contemplated by SP–19 into a suspension of the work for which appellant now seeks compensation.

Appellant cannot be permitted to circumvent one of the most important and central provisions of the agreement which it executed with the government and avoid the consequences of the suspension which it could have prevented and should have prevented in view of SP–19 and its knowledge of the availability of funds.

Leavell attacks the Board's decision claiming that it is not entitled to finality because it fails to comply with the standards of the Wunderlich Act (41 U.S.C. §§ 321, 322) or, in the alternative, that the defendant has breached the contract as a matter of law. The defendant responds that the Board's findings and decision are fully supported by substantial evidence and are correct as a matter of law. It adds, however, in any event, Leavell is precluded from any recovery in this law suit because of the express provisions of the funds available clause in the contract.

It is fairly apparent from the last two paragraphs of the Board's decision, quoted above, that the gravamen of the decision is the Board's finding that Leavell's accelerated pace of operations contributed materially to the necessity for the work suspension during the first six months of 1969. Accordingly, although not specifically articulated, the inference is clear that, in the Board's view, the admitted suspension of the work here came about, at least in part, through Leavell's fault or negligence in maintaining a fast pace. Hence, by its very terms, relief under the suspension of work clause would be unavailable. Despite numerous references by the Board to the funds available clause (SP–19) in

this contract, the decision does not deal with the specific impact of that clause, nor does it attempt to harmonize a possible inconsistency between SP–19 and the suspension of work clause (GP–42) also included in this contract.

This approach to the problem may well account for the entry into the case, as amicus curiae, of The Associated General Contractors of America (AGC). The amicus brief of this well-known national association examines in depth the problem which arises upon the failure of the Government adequately to fund a Government contractor's work according to an approved progress schedule where the contract contains both a funds available clause and a suspension of work clause. AGC takes the position that, irrespective of whether Congress or the contracting agency bears responsibility for inadequate funding, the history and development of the funds available clause show that it was never intended to place the entire risk of insufficient funding on the contractor, especially where it is coupled with the more recent suspension of work clause. To the defendant, however, the amicus brief is simply "a meritless exercise in semantics," a refusal, as it were, to believe that SP–19 really means what it says.

It is obvious from its opinion that the Board decided not to reach the broad question of whether SP–19 overrides the suspension of work clause, GP–42, in cases of funding shortages. Instead, the Board adopted the lenitive solution of finding that Leavell, because of its rapid work pace, had only itself to blame for its troubles.[2] Thus, Leavell's demonstrated efficiency in striving to keep abreast of its approved progress schedule became in the end its *bete noire.* Surely a Government contractor deserves more of an answer than that.

A logical and convenient starting place for analysis of this contract interpretation problem is a brief review of the origin and evolution of SP–19 and its

2. Indeed, the *amicus* assumes that "the Board's decision would have been favorable to the contractor in the absence of a finding of acceleration." *Amicus Brief* p. 47. In reply,

the Government merely observes that this "tongue-in-check [sic] remark is patently without foundation or merit."

predecessor clauses. The so-called "continuing contract" such as the one involved here was first authorized by § 10 of the River and Harbor Act of September 22, 1922, c. 427, 42 Stat. 1043, 33 U.S.C. § 621, providing:

> Any public work on canals, rivers, and harbors adopted by Congress may be prosecuted by direct appropriations, by continuing contracts, or by both direct appropriations and continuing contracts.

Prior to the enactment of Section 10, it had been the practice of the Corps of Engineers to seek a Congressional appropriation for the entire cost of a given project at the outset thereof. The Corps apparently felt obliged to follow such a practice because of the so-called "anti-deficiency" statutes which, *inter alia,* proscribe the involvement of the Government in any contract for future payment of money in excess of appropriations for a given fiscal year.[3] This practice resulted, of course, in the Corps holding large unexpended balances during the initial stages of large multi-year projects thus leading to subsequent difficulties in obtaining other appropriations while the Corps had unused, even though committed, funds. In the interest of economy and efficiency, the Corps requested from Congress the authority to enter into "continuing contracts" whereby Congress would initially authorize a project and each year thereafter appropriate enough money to pay for the work planned for that year.[4] As noted above, Congress was agreeable to this request.

Immediately following the enactment of Sec. 10, the Corps asked the Comptroller General whether it could lawfully enter into a contract pursuant to Sec. 10 for a total cost of approximately $1 million when there was a current appropriation of only $300,000. The Comptroller's decision mentioned the general limitations of the "anti-deficiency" statutes and referred to previous decisions of the Comptroller of the Treasury holding that those statutes did not preclude entering

into a contract for full completion of a project provided payment was limited to the appropriated amount and any payment above that was conditional upon future appropriations. See, 13 Comp. Dec. 478; 14 Comp.Dec. 755.

The proposed specifications submitted by the Corps included such a liability limiting clause, as follows:

> The amount now on hand available for payment for contractors' estimates for the execution of the work to be done as defined in paragraph 19 is about $275,000. It is expected that Congress in accordance with the provisions of the act quoted in this paragraph (act of September 22, 1922) will make additional appropriations before available funds are exhausted, but as to this it must be distinctly understood and agreed that the United States is in no case to be made liable for damages in connection with this contract on account of delay in payment due to lack of funds. Should it become apparent that the available funds will be exhausted before the completion of the contract, the contracting officer will give 30 days' written notice to the contractor that work may be suspended; but if the contractor so elects he may continue work under the conditions and restrictions of the specifications, after the time set by such notice, so long as there are funds for inspection and superintendence, with the understanding, however, that no payment will be made for such work until additional funds shall have been provided in sufficient amount.

With the inclusion of this clause, the Comptroller General determined there was authority to enter into the contract, and stated at 2 Comp.Gen. 477, 479:

> If this paragraph be made a part of the contract and it be specifically provided that the Government is not bound for the payment of any sum in excess of that now available from the allotment by the Secretary of War nor

---

3.  See R.S. 3679, 16 Stat. 251, as amended (31 U.S.C. § 665) and R.S. 3733, 15 Stat. 177 (41 U.S.C. § 12).

4.  See Hearings on H.R. 10766, House Committee on Rivers and Harbors, 67th Cong., 2d Sess., pp. 93–94.

liable in any manner for the failure of Congress from time to time to appropriate funds for so much of the work done in excess of available funds, or to appropriate funds to continue or complete the work, there would appear to be authority for entering into such contract under the authority of the act of September 22, 1922.[5]

For the next 35 years, the exculpatory provisions of the funds available clause remained substantially the same as in the clause quoted above from the Comptroller General's decision. Then, in 1957 and 1958 several major revisions of the clause were made,[6] and (including some later paragraph reorganization) the resulting clause became virtually identical to SP–19 reproduced in Appendix A, infra.

The substantive changes to the extent relevant here included the following:

(a) Work in excess of funds available would be "continued with funds hereafter appropriated *and allotted for this work.*" (Emphasis added; see SP–19(a).)

(b) Provisions relating to the rate of work progress were included and added a further liability disclaimer to the effect that the amount of funds presently available would be the maximum amount available for the current fiscal year and that the Government would in no case be liable for payments in excess of that amount. See SP–19(d).

(c) A provision similar to SP–19(i) was added providing, *inter alia,* that a progress schedule contemplating progress at a greater rate than could be paid for with currently available funds would be approved "only under the condition that such approval will in no way obligate the Government to make additional funds available for the work." [7]

Before proceeding to an analysis of relevant case material, and particularly because of a major contention by Leavell that in the allocation of overall funds appropriated for the Ouachita and Black Rivers project, the Corps acted unreasonably and discriminatorily, a brief summary of the appropriations processes as practiced within Congress and the Corps will be helpful.[8]

A full year before a given fiscal year begins, the Corps' districts prepare their individual budgets based on contractual

---

**5.** The amicus argues that if a liability-limiting clause had to be included, then Sec. 10 was superfluous since the Comptroller of the Treasury had already determined the anti-deficiency statutes did not preclude entering into contracts for more than the appropriated amount so long as *payment* for more than that amount was conditional on future appropriations. Therefore, it is said that the precursor of SP–19 was "unnecessary" and "mistakenly required in continuing contracts" (AGC Brief, p. 25). However valid these observations, their relevancy is doubtful since no one appears to dispute the legality and validity of SP–19 as such, and whether superfluous or not, the fact remains that it is specifically included in the present contract.

**6.** See, for example, EM 1180–1–16, particularly Change 6 on March 17, 1958, and Change 8 on September 2, 1958.

**7.** Subsequent to the arising of the dispute in this case, the progress schedule provisions were further changed to eliminate the contractor's option of submitting for conditional approval an accelerated progress schedule, as occurred here, ER 1180–1–1, Change 14, March 24, 1972. It appears fairly obvious that the change was prompted by the Corps' concern to avoid in the future any semblance of *Government approval of progress schedules*

conflicting with the amount of funds available for payments. The following explanation for the 1972 change appears in the Engineer Contract Instructions:

"Revised coverage in subparagraphs (d) and (i) and a new subparagraph (j) eliminate the contractor's option of submitting for conditional approval a progress schedule that would require funds during the current fiscal year in *excess of the amount stated to be currently* available. The clause as changed provides that the portion of a progress schedule covering the time for which funds have been made available must be consistent with the amount of such funds, and that the contractor, if he intends to work at a faster rate, must submit an additional progress schedule *for information only.*" (ECI 7–671.4) [Emphasis supplied.]

**8.** As stated above, the Board concluded that the Corps acted reasonably in its allocation of available funds and did not unfairly burden Leavell's contract for the benefit of others. The amicus regards it as immaterial whether the responsibility for inadequate funding rests with Congress or with the Corps. (AGC Brief, p. 4, 28.) *Cf., S. A. Healy Co.,* IBCA, 74–2 BCA ¶ 10,708, discussed below.

needs within their respective districts. These are reviewed and frequently adjusted by the Office of Chief Engineer (OCE) and then forwarded for possible further adjustments to the Office of Management and Budget (OMB). They are then sent to subcommittees of the appropriation committees of both Houses of Congress where hearings are conducted. Differences between the two Houses are resolved in conference prior to final passage of the appropriation bill.

In civil works programs, Congress appropriates funds by project only and not by contract. The Conference Report contains an overall deduction for "slippage and shortage" which is a form of underfinancing designed to take into account expected slippage and savings on contracts. While OCE makes a pro-rata deduction for such underfinancing in its allocation to each district it is only at the district level that the actual allotment for individual contracts is made. Therefore, the district has discretion as to how it distributes the available funds among the various contracts within a particular project.

With respect to transfer authority, OCE can transfer to a particular project up to 15 percent of the appropriated funds available for that project at the beginning of a fiscal year.[9] The district engineer has unlimited authority to transfer funds between contracts within a single project, and he has a limited authority to transfer funds between projects up to 10 percent of the original work allowance for that fiscal year, or $100,000, whichever is less.

For FY 1969, the Revenue and Expenditure Control Act of 1968, *inter alia,* placed a ceiling on spending by the Executive Branch. The effect was to reduce the actual expenditure of already appropriated funds by $6 billion in that fiscal year. Faced with the rather novel uncertainties inherent in that Congressional action, OCE decided early in FY 1969 not to utilize its transfer authority for fear of overcommitment of available funds. Towards the end of that fiscal year, however, the financial situation had clarified to the point where the Corps on May 27, 1969, could advise Leavell that the Government had approximately $800,000 available as of July 1, 1969, to pay for materials and equipment delivered to the site prior thereto.[10]

From tabulations contained in the Board record it is clear (and apparently undisputed) that from the date of the contract award through November 29, 1968, when Leavell was notified of the exhaustion of funds, the total amount allocated to this contract exceeded the total amount included for the contract in the budget request by over $427,000. Therefore, of course, Leavell can only complain that OCE should have exercised its discretionary transfer authority. There is, however, substantial evidence that the failure of OCE to exercise its transfer authority in the present circumstances was reasonable conduct necessitated by the expenditure ceiling imposed by the Revenue and Expenditure Control Act. The question remains as to whether the Corps acted reasonably in its allocation of funds and whether it unfairly burdened Leavell's contract for the benefit of others. As this court said in *Winston Bros. Co. v. United States,* 130 F.Supp. 374, 131 Ct.Cl. 245 (1955):

> * * * We think the provision [i.e. the funds available clause] at least means that where the agency authorized to spend the appropriation allocates the funds on a *rational and non-discriminatory basis* and they prove insufficient the Government is not liable for harm resulting from the shortage. [Emphasis supplied.] (*Id.* at 380, 131 Ct.Cl. at 254.)

The question then is whether or not funding of Leavell's contract as compared to other contracts under the project was irrationally or discriminatorily done. The two critical years relative to this dispute concerning the funding of

9. This authority relates only to funds for a project and not to any particular contract since OCE does not allocate to the contract level.

10. Meanwhile, as stated above, Leavell's work on the contract had been suspended from January 10, 1969, to June 16, 1969.

Leavell's contract through date of exhaustion of funds are fiscal years 1968 and 1969. From figures in the Board's record, an analysis of the budget requests and allocations for these years is as follows:

Budget Request

| Fiscal year | Project | Leavell's Contract |
|---|---|---|
| 1968 | $8,700,000 | $2,900,000 |
| 1969 | 8,300,000· | 5,656,000 |
| | $17,000,000 | $8,556,000 |

Conference Report

| Fiscal year | Project | Leavell's Contract |
|---|---|---|
| 1968 | $8,700,000 | Not applicable [a] |
| 1969 | 8,051,000 | Not applicable |
| | $16,751,000 | |

Actual Obligations

| Fiscal year | Project | Leavell's Contract |
|---|---|---|
| 1968 | $9,314,000 | $4,658,300 |
| 1969 | 6,982,000 | 4,500,000 [b] |
| Totals | $16,296,000 | $9,158,300 |

[a] Conference Reports only allocate by projects and not individual contracts.
[b] As of the date of exhaustion of funds.

The significance of the above is that, although the Conference Report allowances for the Ouachita and Black Rivers project were $249,000 less than the budget request for the project for FY 1968 and 1969, funds obligated against plaintiff's contract during the period were $602,300 more than the budget·request for this contract. It is also noted the actual total obligations to the entire project were $455,000 less than the total of the Conference Report allowances for those years. These facts demonstrate that Leavell was not treated unfairly with respect to allocations within this project, and the Board's finding to that effect is fully supported by the evidence before it.

■ This is not the end of the matter, however. There remains the major problem of contract interpretation stemming from the apparent conflict between the funds available clause and the suspension of work clause, both mandatory provisions in a contract such as the

present.[11] In such a situation, the starting point must be "the established canon that contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible." *Thompson Ramo Wooldridge, Inc. v. United States,* 361 F.2d 222, 228; 175 Ct.Cl. 527, 536 (1966).

For the moment, let it be assumed that the Leavell contract did *not* contain the exculpatory language of SP–19 reading:

It is understood and agreed that the Government is in no case liable *for damages* in connection with this contract on account of *delay in payments* to the Contractor due to lack of available funds. [Emphasis supplied.]

Under such a hypothetical assumption, it would seem clear enough that, despite the Board's rather vague indication to the contrary, Leavell would have been entitled to an *equitable adjustment* under the suspension of work clause (GP–42) for the period of work suspension involved. To hold otherwise simply on the ground that the contractor's performance was sufficiently efficient as to be ahead of schedule would seem to be an unwarranted emasculation of GS–42.

The fact remains, of course, that the exculpatory language above quoted was very much present in the Leavell contract, and consideration must therefore be given to the question of whether such language was intended by the contracting parties to be a means of eliminating any possibility of equitable relief under GP–42. To the Government the answer is simple, indeed; wherever delay is the result of funding shortages, the disclaimer of any liability to the contractor is crystal clear and should put an end to the matter. The contractor on the other hand, reads the exculpatory language as disclaiming liability only where the unavailability of funds causing the work suspension amounts to a breach of contract and therefore does not preclude an equitable adjustment under the suspension of work clause.

11. It is, of course, hornbook law in this area that the court is free to decide such a question for itself regardless of the decision of the Board. See, for example, *Paccon, Inc. v. United States,* 399 F.2d 162, 185 Ct.Cl. 24 (1968).

The only case in which this court has considered the effect of a funds available type clause is a Congressional reference case. *Winston Bros. Co. v. United States, supra.* There, in a Bureau of Reclamation irrigation project, funding difficulties arose which faced the Bureau with the problem of how to allocate the available funds among a variety of competing needs. To an extent the Bureau allocated in accordance with its understanding of Congressional wishes expressed in the conference committee report and gave preference to completion of certain power facilities. Accordingly, funds for the plaintiffs' contracts were temporarily curtailed, and they in turn were forced to curtail their operations with resulting standby, overhead, and related expenses. Their contracts contained the following unambiguous disclaimer of liability for the consequences of insufficient funding:

*Specifications, par. 11.*

*Failure of Congress to appropriate funds.* If the operations of this contract extend beyond the current fiscal year, it is understood that the contract is made contingent upon Congress making the necessary appropriation for expenditures thereunder after such current year has expired. In case such appropriation as may be necessary to carry out this contract is not made, the contractor hereby releases the Government from all liability due to the failure of Congress to make such appropriation. 130 F.Supp. at 376, 131 Ct.Cl. at 247.

In determining that this provision foreclosed any judicially enforceable claim, the court said:

Assuming, then, that the Bureau's allotment between power and irrigation was lawful, we reach the Government's defense that it was not a breach of contract for the Government to fail to make funds available to pay for work for which it had contracted. The Government bases this defense upon the provision of the contracts which we have quoted earlier in this opinion. That provision, Paragraph 11 of the Specifications, said that if the

operations of the contract extended beyond the current fiscal year, the Government would not be liable for the consequences of the failure of Congress to appropriate funds to carry out the contract.

The plaintiffs urge that this provision is no defense. They point to the language "In case such appropriation as may be necessary to carry out this contract is not made * * *" and say that, taking each plaintiff's contract by itself, there was plenty of money appropriated to carry it out, even after giving the preference to the power features of the project. We think that this is a too literal reading of Paragraph 11. It would make the provision practically inapplicable except in cases where specific parts of appropriations were earmarked for particular contracts. *We think the provision at least means that where the agency authorized to spend the appropriation allocates the funds on a rational and non-discriminatory basis and they prove insufficient, the Government is not liable for harm resulting from the shortage.* 130 F.Supp. at 380, 131 Ct.Cl. at 253-4 [emphasis added]

It should be noted that in *Winston* the claims were asserted as tantamount to a breach of contract rather than for an equitable adjustment under a suspension of work clause, as here. There is nothing in the case to indicate whether the *Winston* contracts contained such a clause, and it may be assumed they did not. The case is relevant here, therefore, only insofar as it establishes a standard of conduct for agencies in their allocation and allotment of available funds, and it has already been concluded above that the Corps' allocation in the present case was neither irrational nor discriminatory.

Except for the present case, the question of interaction between the funds available and suspension of work clauses seems to have arisen only before the Department of interior Board of Contract Appeals. *Granite Construction Co.,* 72-2 BCA ¶ 9762, and *S. A. Healy Co.,*

74–2 BCA ¶ 10,708. In *Granite*, the contractor sought to recover its costs incurred during a constructive suspension of work when funds became unavailable due to a Presidential impoundment action. As stated by the Board:

> The issue before us is the applicability of the standard Suspension of Work clause where completion at a date earlier than provided for in the contract was authorized by the Government but was delayed as a result of funding problems. [p. 45,583]

The ICBA decided the issue adversely to the contractor but on grounds that show the case to be entirely distinguishable from the present one. In the first place, the Board treated the executive impoundment of funds as a "sovereign act" clearly not attributable to the contracting officer under the suspension of work clause. In addition, while the two clauses under discussion were quite similar in both *Granite* and the present case, there are some significant differences. In *Granite*, the suspension of work clause specifically excepted from its reach any "equitable adjustment  *  *  excluded under any other provision of this contract," an exception not present in the instant case. Also, the funds available clause in *Granite* raised the following "red flag" to every prospective bidder:

> The contractor is also cautioned that the prosecution of the work at a rate that will exhaust the funds reserved before the end of the fiscal year will be *at his own risk.* [Emphasis supplied.]

No such risk allocation language is present in the funds available clause of the Leavell contract. Because of these several distinctions, the Government's reliance on *Granite* as a significant precedent seems misplaced.

In the *Healy* case (n.8), the same funds available clause was present as in *Granite* but the funding shortage there resulted from the agency's own administrative decisions. Healy's proposed construction schedule, which contemplated accomplishing most of the work at the beginning of the contract, had been approved "without comment". The budget requests submitted by the agency, however, reflected light funding in the beginning and heavy funding toward the end of the contract period. Healy argued that the agency's action was a constructive change of the schedule and sought an equitable adjustment under the *changes clause.*

The Government's motion to dismiss on the ground that Healy's sole remedy was for breach of contract was denied with direction for a further hearing to determine what action, if any, the contractor had taken to scale down its operations to conform to the funds available.

From the foregoing, it is clear that the precise relationship of the funds available clause (SP–19) to the suspension of work clause (GP–42), and the risks allocated thereby, remain undefined. In considering that relationship, it is important to keep constantly in mind the basic principles developed by this court over the years in harmonizing separate provisions of a Government contract. Very recently, Judge Davis has given us an admirable and concise summary of those principles in his opinion for the court in *Contra Costa County Flood Control and Water Conservation District v. United States,* 512 F.2d 1094, 1098, 206 Ct.Cl. 413, 421, decided March 19, 1975. There, he observes:

> *Bilateral contracts should be applied, if fairly possible, so as not to put one side at the mere will or mercy of the other. Padbloc Company v. United States,* 161 Ct.Cl. 369, 376–77 (1963); *Deloro Smelting & Refining Co. v. United States,* 317 F.2d 382, 387, 161 Ct.Cl. 489, 496–97 (1963).
>
> This coordination of the various terms of the agreement seem to us distinctly preferable, even without the *contra proferentem* rule, to the Government's understanding that it had all (or nearly all) the rights and practically no responsibilities. But if the contract be deemed more ambiguous and less clear, then the usual canon should be invoked. *Sturm v. United States,* 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (1970). *The Government*

*presented plaintiff with the form of the agreement, and the plaintiff's interpretation was at least reasonable, if not in fact the better one.* [Emphasis supplied.]

To Leavell and the amicus, AGC, it is important to recall that in the years preceding the adoption of a funds available clause in the early 1920s, a failure on the part of Congress for any reason to fund an existing Government contract was held to be a breach of contract. *See*, for example, *Ferris v. United States*, 27 Ct.Cl. 542 (1892). In such event, the contractor presumably would have been entitled, on the date of fund exhaustion, to discontinue performance and pursue its breach of contract remedies, including future profits. But SP–19 (and its predecessor clause) changed all that by saying in effect that such an exhaustion of funds was not a breach and that the contractor must either finance the work himself, or in the alternative, suspend activities but stand by and remain available to recommence work when, and if, funding was resumed. Thus, says Leavell, it is reasonable to interpret SP–19's liability disclaimer as applicable *only to damages for breach of contract.*

When, many years later, the suspension of work clause came into vogue with its equitable adjustment concept, it was reasonable to assume, say Leavell and AGC, that the exculpatory language of SP–19, unchanged since 1923, continued as before to apply *only* to damages for breach and was never designed or intended to preclude an equitable adjustment under the much later suspension of work clause.[12] Were this not to be so, the argument goes, it would have been a simple thing indeed to have added to SP–19's exculpatory language a specific prohibition against equitable relief under GP–42.[13]

There is little doubt of the historical validity of the distinction drawn by Leavell and the AGC between damages for breach of contract as precluded by SP–19 and an equitable adjustment for unreasonable delays contemplated by the suspension of work clause. A number of decisions by this court demonstrate the difference. For example, in *John A. Johnson & Sons v. United States*, 180 Ct.Cl. 969 (1967) the court concluded:

*But the plaintiff's right to a price adjustment under the suspension of work clause does not depend on a breach of the contract by the defendant.* The issue is whether the defendant, for its own advantage and convenience in administering the project, has taken action which delayed the plaintiff's access to its worksites for an unreasonable length of time and thereby caused the plaintiff additional expense not due to the plaintiff's fault or negligence. *If it has, the suspension of work clause directs that the contracting officer shall make an equitable adjustment in the contract price.* 180 Ct.Cl. at 990 [Emphasis supplied.]

In the same vein are the cases of *T. C. Bateson Constr. Co. v. United States*, 319 F.2d 135, 162 Ct.Cl. 145 (1963); *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 187 Ct.Cl. 15 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970); and *Merritt-Chapman & Scott Corp. v. United States*, 429 F.2d 431, 192 Ct.Cl. 848 (1970). In *Merritt-Chapman*, the court stated:

\* \* \* There is no doubt, as the trial commissioner holds, that the work was in fact suspended and delayed for the Government's convenience, and also that there was a significant change in design. It is immaterial, in this instance, whether or not the suspension and delay was due, in whole or in part, to the Government's fault.

---

**12.** The clause appears to have originated with the Corps of Engineers during World War II and, at least in part, was designed to ameliorate what many considered to be a harsh result in *United States v. Rice*, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942). *See* Easterwood, "Pay For Delay," 1 Govt. Contracts Rev. 5 (Jan. 1957) and Clarke, "Government-

Caused Delays in the Performance of Federal Contracts," 22 Mil.L.Rev. 1, 28 (Oct. 1963).

**13.** This principle was once described by the late Judge Jerome Frank as the familiar "easy-to-say-so-if-that-is-what-was-meant" rule. *Commissioner v. Beck's Estate*, 129 F.2d 243, 245 (2d Cir., 1942).

There are occasions for the Suspension of Work clause to operate when the Government is at fault, as we recently noted (See *Chaney & James Constr. Co. v. United States,* 421 F.2d 728, 731–33, 190 Ct.Cl. 699, 705–08 (1970)), but the clause can likewise be effective, as we have also held, when there is a suspension not due to the Government's fault, dereliction or responsibility. See *T. C. Bateson Constr. Co. v. United States,* 319 F.2d 135, 162 Ct.Cl. 145 (1963); *John A. Johnson & Sons v. United States,* 180 Ct.Cl. 969 (1967). An instance of the latter category is a suspension and delay which lasts so long (regardless of the absence of government fault) that the contractor cannot reasonably be expected to bear the risk and costs of the disruption and delay. That is one type of suspension and delay "for an unreasonable length of time causing additional expense", within the meaning of the clause. Depending on the circumstances, a delay due to a non-fault suspension by the Government can obviously be so protracted that it would be unreasonable to expect the contractor to shoulder the added expense himself. We think that in its terms and its purpose the Suspension of Work clause covers that situation, among others. 429 F.2d at 432, 192 Ct.Cl. at 852.

Under the rationale of these cases, it is fair to conclude that an SP–19 suspension is one for the convenience of the Government within the intendment of the suspension of work clause. Such a suspension is clearly designed to keep the contractor available for a period of time after exhaustion of funds while the contracting agency awaits either additional funding from the Congress or from discretionary allocations of appropriated funds within its own organization. In these situations, when funding again becomes available, the Government is spared the expense, delay, and inconvenience incident to reletting the contract. Surely the Government should expect to pay for this extra contract right by reimbursing the contractor for his additional costs incurred while in stand-by status unless through clear and specific language that risk is allocated to the contractor alone.

From all that has been said, I am constrained to conclude that, in the words of *Contra Costa, supra,* "the plaintiff's interpretation was at least reasonable, if not in fact the better one." Clearly, a contractor operating under a contract containing both SP–19 and GP–42 must realize he bears the risk of suspension for lack of funds even though his work progress is current. In such event, he knows he has no right to profit on any suspension costs, nor does he have any right to damages for breach of contract. Further, he must realize that if he is able and decides to finance the work himself, there is no guarantee of recovery even of the interest paid on money borrowed for that purpose. By a fair reading of the two clauses, however, he would not be alerted to the Government's present contention that he bears the *additional* risk of enduring a suspension of work under an approved schedule without any reimbursement for his stand-by costs.

Since it is fair to ask that when prospective Government contractors are evaluating their risks for contingency bidding purposes, they should be precisely informed as to where all contractual risks are allocated, it is my opinion that SP–19 and GP–42 should be harmonized so as not to defeat both reasonable and legitimate expectations of the contractor. Particularly is this true when it is considered that, assuming the Government's adversarial position in this lawsuit to be truly representative of the contracting agency's original intention, SP–19 could have easily been worded so as specifically to preclude any equitable adjustment under GP–42 for a suspension delay attributable to a funding shortage. I consider it of controlling significance that this was never done.

Accordingly, the decision of the Corps of Engineers Board must be reversed to the extent it holds, as a matter of law, that Leavell is not entitled to an equitable adjustment under the suspension of work clause for its delay costs between January 10, 1969 and June 16, 1969.

## CONCLUSION OF LAW

Plaintiff's motion for summary judgment is granted, defendant's cross-motion is denied, and the case is remanded to the Corps of Engineers Board of contract Appeals. Further proceedings are stayed pursuant to Rule 149 for a period of six months to afford the parties an opportunity to obtain an administrative resolution by the Board of the equitable adjustment in contract price to which plaintiff is entitled. The attorney of record for plaintiff is designated to advise the court, by letter to the trial judge (with copy to opposing counsel), of the status of proceedings on remand, such advice to be given at intervals of 90 days, or less, from the date hereof. Attention of counsel and the Board is also directed to Rule 150.

## APPENDIX A

SP–19. *Funds Available for Payments.*

(a) Such work as may be done under this contract in excess of the amount for which funds are available for payment as herein set forth, will be continued with funds hereafter appropriated and allotted for this work.

(b) From funds heretofore appropriated, the sum of $75,000.00 is available for payments to the Contractor for work performed under this contract, including the retained percentage.

(c) If at any time it becomes apparent to the Contracting Officer that the balance of this allocation is in excess of the amount required to meet all payments due and to become due the Contractor because of work performed and to be performed pursuant to his approved progress schedule, the right is reserved after due notice to the Contractor to reduce said allocation by the amount of such excess.

(d) If the rate of progress of the work is such that it becomes apparent to the Contracting Officer that the balance of this allocation and any allocation for this and any subsequent fiscal years during the period of this contract is less than that required to meet all payments due and to become due the Contractor because of work performed or to be performed under this contract, the Contracting Officer may provide additional funds for such payments if there be funds available for such purpose. The Contractor will be notified in writing of any additional funds so made available. However, it is distinctly understood and agreed that the amount of funds stated in (b) above is the maximum amount the Government insures will be available during the current fiscal year and the Government is in no case liable for payments to the Contractor beyond this amount prior to having notified the Contractor in writing of any additional funds that can be made available. Accordingly, no progress schedule will be approved (see paragraph (a) of the clause of the contract entitled "Progress Charts and Requirements for Overtime Work") which contemplates progress requiring funds in excess of the amounts stated to be available in (b) above for the current fiscal year and no progress schedule will be approved for any ensuing fiscal year which contemplates progress requiring funds in excess of the amount allocated by the Contracting Officer from funds subsequently made available, except as set forth and subject to the conditions in subparagraph (i) below.

(e) It is expected that, during the subsequent fiscal years over the period of this contract, Congress will make additional appropriations for expenditure on work under this contract. The Contracting Officer will notify the Contractor of any additional allocation of funds to this contract when such funds become available. It is understood and agreed that the Government is in no case liable for damages in connection with this contract on account of delay in payments to the Contractor due to lack of available funds. Should it become apparent to the Contracting Officer that the available funds will be exhausted before additional funds can be made available, the Contracting Officer will give at least 30 days written notice to the Contractor that the work may be suspended. If the Contractor so elects, after receipt of such notice, he may continue work under the conditions and restrictions under the

specifications, so long as there are funds for inspection and superintendence, with the understanding, however, that no payment will be made for such work unless additional funds shall become available in sufficient amount. When funds again become available, the Contractor will be notified accordingly. Should work be thus suspended, additional time for completion will be allowed equal to the period during which work is necessarily so suspended, as determined by the dates specified in the above-mentioned notices.

(f) So long as funds are available, payments will be made monthly in accordance with article of the contract entitled "Payments to Contractors." The unit prices or lump sum price stated in the contract will be used in determining the amount to be paid for work performed by the Contractor.

(g) The procedure above described will be repeated as often as may be necessary on account of the exhaustion of available funds and the necessity of awaiting the appropriation of additional funds by Congress.

(h) Should Congress fail to provide additional funds the contract may be terminated and considered to be completed, at the option of the Contractor, without prejudice to him or liability to the Government, at any time subsequent to 30 days after payments are discontinued, or at any time subsequent to 30 days after the passage of the Act which would have but did not carry an appropriation for continuing the work or after the adjournment of the Congress which failed to make the necessary appropriations. However, if the funds cited in the contract are enough to extend the work beyond the end of the fiscal year and no new funds are allocated to this contract for the ensuing fiscal year, the Contractor must first exhaust all the cited funds and thereafter he may, at his option, exercise the rights provided in this paragraph any time after payments are discontinued.

(i) The progress chart prepared in accordance with paragraph (a) of the clause of the contract entitled "Progress Charts and Requirements for Overtime Work" will be consistent with the amount of funds stated in subparagraph (b) above as being currently available for the period of time from the date of contract award to the end of the fiscal year in which the contract was awarded, or at the option of the Contractor, the chart may be prepared on the basis of accomplishment of work at a greater rate of progress for the period of time applicable to currently available funds. Any chart initially submitted for approval which contemplates progress at a greater rate than can be paid for with currently available funds will be approved only under the condition that such approval will in no way obligate the Government to make additional funds available for the work. That part of the chart which covers the work for which funds are not currently available will be prepared on the basis of a schedule considered to be practicable by the Contractor for the accomplishment of the work at such rate of progress as he may desire for completion within the terms of the contract. The progress chart will be revised each time the Contractor is notified that additional funds are made available. Each revision will conform with the criteria stated above. With reference to the responsibilities for future funding of the work in accordance with the progress chart, attention is called to the preceding subparagraphs wherein the responsibilities of the Government are set forth for the furnishing of funds for the work. The approval of that part of the schedule covering work for which funds are not currently available will in no way obligate the Government to provide funds to accomplish work at the rate of progress indicated in the schedule.

GP–42. *Price Adjustment for Suspension, Delays, or Interruption of Work (Nov.1961)*

(a) The Contracting Officer may order the Contractor in writing to suspend all or any part of the work for such period of time as he may determine to be appropriate for the convenience of the Government.

(b) If, without the fault or negligence of the Contractor, the performance of all

or any part of the work is for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of the contract or by his failure to act within the time specified in the contract (or if no time is specified within a reasonable time), an adjustment shall be made by the Contracting Officer for any increase in the cost of performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay, or interruption, and the contract shall be modified in writing accordingly. No adjustment shall be made to the extent that performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed, or interrupted. No claim under this clause shall be allowed (i) for any costs incurred more than 20 days, before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply where a suspension order has been issued), and (ii) unless the claim in an amount stated, is asserted in writing as soon as practicable after the termination of such suspension, delay, or interruption but not later than the date of final payment under the contract. Any dispute concerning a question of fact arising under this clause shall be subject to the dispute clause. (ASPR 7–602.46).