S. A. HEALY COMPANY

v.

The UNITED STATES.

No. 328–76.

United States Court of Claims.

April 19, 1978.

Jesse B. Grove, III, San Francisco, attorney of record for plaintiff; Jon T. Anderson and Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., of counsel.

Gerald L. Schrader, with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUM-
MARY JUDGMENT AND DEFEND-
ANT'S CROSS–MOTION FOR SUM-
MARY JUDGMENT

NICHOLS, Judge, delivered the opinion of the court:

This Wunderlich Act case comes before the court on plaintiff's motion and defendant's cross-motion for summary judgment in review of a decision of the Department of Interior Board of Contract Appeals. The case was initially referred to a trial judge of this court who issued an order pursuant to Rule 166(b) to the effect that the appeal is limited to questions of law within the purview of section 2 of the Wunderlich Act.

The plaintiff herein, S. A. Healy Company, seeks a monetary award under Construction Contract No. 14–06–D–7058, in the form of an equitable adjustment for losses incurred in a shutdown of work. Plaintiff alleges the shutdown was caused by defendant's failure to request and secure sufficient funds from Congress to finance the project for a full fiscal year. Defendant disclaims liability, arguing principally that the work stoppage was brought about instead by plaintiff's voluntary acceleration of performance. The Interior Board of Contract Appeals found for defendant. We hold that defendant was ultimately responsible for the shutdown, and find in favor of plaintiff.

In November of 1970, plaintiff was awarded a fixed price contract for the construction of two tunnels and diversions and appurtenant structures for the Strawberry Aqueduct, a Central Utah Project sponsored by the Bureau of Reclamation. The contract divided the work into two parts. Part one consisted of diversion works with a November 18, 1971, deadline for completion. The remainder of the work, including construction of the tunnels and a concrete siphon, was contained in part two, to be completed within 1,400 days of the notice to proceed. Defendant notified plaintiff to proceed on November 18, 1970, which set September 19, 1974, as the completion date for part two.

For purposes of this suit, the significant clauses in the contract are paragraphs 11 and 15. Paragraph 11, "Funds Available for Earnings," provides in pertinent part:

Pursuant to Section 12 of the Reclamation Project Act of 1939 (43 U.S.C. Sec. 388), funds for earnings under this contract will be made available as provided in this paragraph.

a. Under the contract to be entered into under these specifications, the liability of the United States is contingent on the necessary appropriations being made therefor by the Congress and an appropriate reservation of funds thereunder. Further, the Government shall not be liable for damages under this contract on account of delays in payments due to lack of funds.

b. Funds for payment of earnings under this contract are included in the budget for fiscal year 1971 which is now before the Congress and it is anticipated that they will be included in the Appropriation Act of fiscal year 1971. Prior to the effective date of the Appropriation Act, payment for earnings may be made from such funds as may be available by appropriations for interim periods by Congress within such limitations as may be imposed by Congress. The contractor will be advised of funds which are thus available. After the Appropriation Act is effective, the contractor will be notified of the sums, if any, reserved and available for payments under this contract for the fiscal year 1971. During this period between the end of fiscal year 1970 and the effective date of the Appropriation Act for fiscal year 1971, the provisions of Subparagraph e. regarding the giving of notices by the contractor and the Government as to exhaustion of funds shall not apply.

\*　　\*　　\*　　\*　　\*　　\*

e. Should it become apparent to the contractor that existing fund reservations will be exhausted within the next 30 days, the contractor shall at that

time give written notice thereof to the contracting officer. If additional funds can be made available, the contracting officer may issue an additional fund reservation as provided for in Subparagraph d. hereof. It is expressly understood, however, that the Government has no obligation to provide funds in addition to those reserved in writing. The contractor is also cautioned that the prosecution of the work at a rate that will exhaust the funds reserved before the end of the fiscal year will be at his own risk. If additional funds cannot be made available, the contracting officer will give written notice thereof to the contractor. If at any time funds are being made available by appropriations for interim periods prior to the enactment of an Appropriation Act, the contractor will be so advised in writing in which case the other notice requirements of this subparagraph will not apply. * * *

This paragraph also provides various procedures to be followed by the contractor in the event of an exhaustion of funds. In general, the contractor has the choice of continuing performance while awaiting the availability of additional funds, or suspending performance until additional funds are forthcoming. In the latter event, additional time for completion is allowed commensurate with the time when suspension became necessary.

Paragraph 15, "Construction Program," provides in part:

Within forty-five (45) calendar days after date of receipt of notice of award of contract, the contractor shall submit to the authorized representative of the contracting officer for approval a complete and practicable construction program. The construction program shall show in detail his proposed program of operations and shall provide for orderly performance of the work. Pending approval of his program the contractor shall proceed with the work in accordance with these specifications and his proposed construction program.

The construction program shall be in such form and detail as to show the following:

a. Sequence of operations.

b. The dates for commencing and completing the work on the several controlling features of the project. (Including erection of construction plant and each item or group of like items involving placement of concrete, if applicable.)

c. The dates of issuance of orders for procurement of contractor-furnished materials and equipment and their delivery and installation dates.

d. The dates on which contractor-prepared drawings will be submitted for approval (including all shop drawings as required in these specifications).

The construction program shall be in suitable form and show the percentage of work for each line item scheduled for completion each month, and shall include the contractor's estimate of earnings by months. The contractor's estimate of earnings by months shall not obligate the Government to provide funds in any manner other than as provided in the paragraph of these specifications entitled "Funds Available for Earnings."

* * * * * *

Plaintiff was advised on December 3, 1970, that $500,000 had been reserved for payments under the contract through June 30, 1971. On December 22, 1970, plaintiff submitted a proposed construction program, as required by paragraph 15, projecting expected earnings under the contract. Plaintiff's schedule forecasted earnings of $116,-000 in fiscal year 1971, $4,887,000 in fiscal year 1972, $4,714,000 in fiscal year 1973, and $1,254,000 in fiscal year 1974. The construction engineer, an authorized representative of the contracting officer, approved plaintiff's proposed program, without comment, in February 1971.

Plaintiff proceeded with work under the contract promptly. By the summer of 1971, construction under part one was well advanced and plaintiff had begun tunneling operations under part two. In fact, plain-

tiff's progress under the contract was at a pace somewhat faster than that planned in the construction program. Earnings for fiscal year 1971 were $345,000 rather than $116,000 as predicted. Since $500,000 was reserved for fiscal year 1971 earnings, however, no immediate difficulties were presented.

Meanwhile, the President submitted his 1972 fiscal year proposed budget to Congress in late January 1971. Only $1,800,000 was requested for earnings under plaintiff's contract for the 1972 fiscal year. Defendant notes, however, that the Utah Congressional delegation recommended that Congress double the total amount requested for the Bonneville Unit of the Central Utah Project (which included plaintiff's contract), from $10,000,000 to $20,000,000. The Bureau of Reclamation similarly testified that an additional $11,450,000 could be used effectively by the project in fiscal year 1972, particularly to allow the contractors to proceed more efficiently. See Hearings before a Subcommittee of the Senate Committee on Appropriations, 92d Cong., 1st Sess., vol. 1, part 4, 555, 563, 565, 570 (1971); Hearings before a Subcommittee of the House Committee on Appropriations, 92d Cong., 1st Sess., vol. 1, part 3, 333 (1971) (statement of Commissioner Armstrong).

In July 1971, the contracting officer advised plaintiff by letter that the amount of $1,800,000 had been included in the then-pending budget for earnings under the contract. The contracting officer also cautioned plaintiff not to prosecute construction at a rate in excess of the funds provided in the budget request. Plaintiff replied immediately, protesting that the recommended amount was "totally inadequate" and would hinder the company from proceeding "efficiently and economically." Subsequently, plaintiff inquired about the possibility of a supplemental appropriation and was advised that the prospect of receiving additional funds was bleak. Defendant furnished no more optimistic forecast until the stoppage was actually effective, nor did it say it would request supplemental funds until after it had done so.

After considering the available courses of action, plaintiff decided to proceed as far as possible and stop work when funds were exhausted. Healy continued construction at the pace it had set all along, which was considerably more rapid than that forecast in the construction program. On September 1, 1971, plaintiff advised the contracting officer that funds would be exhausted within 30 days and gave formal notice of the need for "additional funds to continue the work." Plaintiff suspended tunneling operations on September 22, 1971. Work continued on part one of the contract, to the extent funds permitted (an additional reservation of $350,000, made in August, was applied to part one work). Part one was not completed on schedule, however, and an extension of 35 days was granted by the contracting officer.

Construction under part two of the contract did not resume until February 28, 1972. Before that date, in November of 1971, a supplemental appropriation request was forwarded to Congress making available for earnings under plaintiff's contract an additional $3,650,000 for fiscal year 1972. Congress passed this supplemental appropriations bill on December 15, 1971. On January 10, 1972, defendant notified plaintiff that supplemental funds were available for fiscal 1972 earnings. Plaintiff began immediately to remobilize its work force and carried out modifications to its equipment. By the time work recommenced, the shutdown had been of 160 days' duration.

Plaintiff timely requested that the contracting officer treat the stoppage as a change under the changes article or, alternatively, as a suspension of work. Under either approach, plaintiff would be entitled to an equitable adjustment of the contract price to reflect the costs of shutting down tunneling operations. Plaintiff's request was denied by the contracting officer, and timely appeal was filed with the Interior Board of Contract Appeals. In an opinion issued in 1974, the Board denied the government's motion to dismiss, holding that a cause of action within the Board's jurisdiction had been stated because plaintiff al-

leged that the shortage of funds available for earnings was caused by the negligence of the agency. *S. A. Healy Co.*, IBCA No. 944–12–71, 74–2 BCA ¶ 10,708. After hearing the case, however, the Board concluded that plaintiff could not recover. 76–1 BCA ¶ 11,793. The Board's decision was predicated on data showing that the stoppage would not have occurred had plaintiff adhered to the approved construction program, mainly because the supplemental appropriation was passed in the nick of time. Had plaintiff abided by the original schedule, earnings would just about have caught up with the funds actually available (some $2,300,000), when the additional financing became available in January. Instead, plaintiff, by its own action in accelerating construction, exhausted all the reserved funds in September. Plaintiff, therefore, and not defendant, was responsible for the stoppage of work, according to the Board.

Plaintiff argues that the Board's analysis takes a fallacious approach to the question presented. In essence, after approving the proposed schedule of earnings, the government had a duty to facilitate that schedule, by requesting full fiscal year funding of Congress. Defendant instead asked only for $1,800,000, a figure some $3,000,000 short of the estimated earnings for the fiscal year. Once that occurred, plaintiff was no longer able or obliged to follow the agreed upon schedule for the simple reason that without a supplemental a shutdown was sure to be required at some point during the fiscal year. In effect, defendant had itself abandoned the schedule, and any intent it had to save it by obtaining a supplemental it kept strictly to itself. The only question was when the shutdown could occur with least harm. Plaintiff reexamined its position, and concluded that the most economically feasible approach would be to continue at the more rapid pace it had earlier adopted and bring about the shutdown before winter, when working conditions are less favorable. Plaintiff reasons, therefore, that the stoppage was ultimately created by defendant's actions in budgeting inadequate funds for earnings under the contract. We agree, and for reasons explained more fully below, hold in favor of plaintiff.

Defendant has consistently urged that this claim is barred by the terms of paragraph 11 of the contract, set forth, *supra*, which exculpate the government from liability when Congress fails to appropriate funds needed for the contract. In addition, defendant asserts that section 12 of the Reclamation Project Act of 1939, 43 U.S.C. § 388, which contains similar language, also precludes plaintiff's cause of action. Section 12 of the Reclamation Act provides:

> When appropriations have been made for the commencement or continuation of construction or operation and maintenance of any project, the Secretary may, in connection with such construction or operation and maintenance, enter into contracts for miscellaneous services, for materials and supplies, as well as for construction, which may cover such periods of time as the Secretary may consider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefor.

According to defendant, the clear import of these provisions is to place upon plaintiff all the risk of a shortage or exhaustion of funds, no matter what the underlying reason is for Congress' failure to appropriate the needed amounts.

A review of the existing precedent demonstrates that the funds available clause has never been construed so broadly as defendant would like. To date, this court has decided two cases in point, and the Interior Board of Contract Appeals has heard two such cases, including this one.

In *Winston Bros. Co. v. United States*, 130 F.Supp. 374, 131 Ct.Cl. 245 (1955), the Bureau of Reclamation had originally requested some $62,500,000 to fund construction in connection with the Columbia Basin Project, in which plaintiff's contract was included. The Secretary of the Interior pared the figure to $52,500,000, which was further reduced by the Bureau of the Budget to $27,500,000. By the time Congress acted, the final amount appropriated was

$17,500,000. The agency, in administering the project, allocated funds as best it could among the several contracts involved. Winston Bros. sued, claiming funds were actually available, but were not allocated to its own contract, and that therefore the government was not exempted by means of the funds available clause. The court found for defendant because the agency had acted rationally and in a nondiscriminatory fashion in allocating funds among the several contracts under the project. 130 F.Supp. at 380, 131 Ct.Cl. at 254, *Winston*, thus, involved a failure of Congress to appropriate the funds requested of it; there was no fault on the part of the agency, which had requested sufficient funds to finance the contract in accordance with an approved schedule.

The other case decided by this court is *C. H. Leavell & Co. v. United States*, 530 F.2d 878, 208 Ct.Cl. 776 (1976). *Leavell* involved a suit under a Corps of Engineers continuing contract, containing a funds available clause somewhat similar to Healy's paragraph 11(a). An appropriation cut-off occurred and work was suspended. Leavell sought an equitable adjustment under the contract suspension of work clause. The court held that as the contract was worded the suspension of work clause allowed an equitable adjustment for a suspension thus caused, despite the exculpatory language in the funds available clause, which barred breach damages.

The Board opinion dealing with the funds available clause is *Granite Construction Co.*, IBCA No. 947–1–72, 72–2 BCA ¶ 9762. Here some of the money appropriated for Granite's contract was impounded by the President as an anti-inflationary policy. Plaintiff took the position that the impounded funds were in fact available because they had been appropriated by Congress, and sought an equitable adjustment under the suspension of work clause. The Board denied recovery because there was no action taken by the contracting officer to delay or disrupt work, as required by the suspension of work clause. The disruption was caused both by the initial action of Congress in not appropriating funds, and then by the President in impounding them.

In none of the decided cases, then, was the agency responsible in any way for the unavailability of funds. One distinction between these cases should be noted for later reference. In *Leavell*, the court found that the risk of financial loss from a stoppage was not undertaken by the plaintiff. In *Granite*, the Board pointed to language in the funds available clause, to the effect that "prosecution of the work at a rate that [would] exhaust the funds reserved before the end of the fiscal year would be at [the contractor's] own risk," to support its determination. The different outcome in these two cases, then, rests upon the different assumptions of risk by the contractors.

Defendant argues that paragraph 11 places all the risk of loss from exhaustion of funds upon the plaintiff. One of the arguments offered in support of this proposition is the wording of the second sentence in subparagraph (a): "Further, the Government shall not be liable for damages under the contract on account of delays in payments due to lack of funds." This, according to defendant, is an independent exculpatory statement, not qualified in any way. Thus, the contractor, having agreed to this sentence, assumed the full risk of a funds shortage, whatever the underlying cause. The difficulty with defendant's argument is that at best, this statement, in its context, is ambiguous. The reader might reasonably suppose, since the sentence is juxtaposed with another sentence relieving the government of liability should Congress together fail to appropriate funds, that the intent was similarly to protect defendant from liability should appropriations only be delayed by Congress. The contents of subparagraph 11(a), as well as those of the Reclamation Act, are simply not designed unequivocally to put the contractor on notice that he bears all the risk of loss ensuing from the unavailability of funds for earnings, no matter what the reason therefor.

This ambiguity, in fact, pervades all of paragraph 11 of the contract. For example, defendant has also suggested that the fol-

lowing sentence in subparagraph (e) of clause 11 serves to exculpate defendant here: "The contractor is also cautioned that the prosecution of the work at a rate that will exhaust the funds reserved before the end of the fiscal year will be at his own risk." It is defendant's contention that this statement alone serves as a "red flag," warning prospective contractors that they bear the risk of insufficient appropriations and resultant shutdowns. This interpretation is supported by citation to *C. H. Leavell, supra,* wherein this particular sentence, which is standard in Bureau of Reclamation contracts, was singled out by the trial judge, in an opinion adopted by the court, as such a red flag. 530 F.2d at 891, 208 Ct.Cl. at 800. *Leavell,* however, is somewhat inapposite here. This was a case in which Congress was responsible for cutting the budget request. The parties were contesting the applicability of the suspension of work clause to the costs incurred in a shutdown necessitated by the exhaustion of funds available and reserved for the contract. This sentence was quoted in the opinion to illustrate the point that if such language had been contained in the *Leavell* contract, and Congress had appropriated inadequate funds for the fiscal year, then the contractor would have been warned of the risk allocation and would not have .been entitled to an equitable adjustment under the suspension of work clause. Similarly, in *Granite* the unavailability of funds was attributable to Presidential impoundment and not to any particular omission of the Bureau of Reclamation. Thus the funds available clause was sufficiently clear to shift the risk of loss to the contractor. If Congressional budget paring, or Presidential impoundment had been the cause of the shortage of funds for Healy's contract, perhaps the principle in *Granite* would apply, and no recovery could be afforded plaintiff. Congress cannot be faulted for the shortage here, however, because it appropriated all that was requested. The agency simply did not make an adequate request. Whether or not the funds available clause clearly allocates all risk of loss to the contractor when Congress cuts budget requests, we hold that

the clause as a whole is not sufficient to shift this burden to the contractor when the administrative agency is at least partly to blame for the funds shortage.

This holding comports with a wealth of decisions following the proposition that when a portion of a contract is susceptible of more than one interpretation, the construction placed on it by the non-drafting party must prevail. *See, e. g., C. H. Leavell & Co. v. United States, supra,* 530 F.2d at 891–92, 208 Ct.Cl. at 801; *Contra Costa County Flood Control v. United States,* 512 F.2d 1094, 1098, 206 Ct.Cl. 413, 421 (1975); *Sturm v. United States,* 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (1970); *Sun Shipbuilding & Dry Dock Co. v. United States,* 393 F.2d 807, 816, 183 Ct.Cl. 358, 372–73 (1968). Plaintiff is the non-drafting party, and this court cannot place the burden of loss from the agency's failure to request adequate funding for the project upon plaintiff in the absence of clear unambiguous contractual language doing so. Plaintiff could reasonably have construed this clause to place upon contractors only the risk of exhaustion of funds from action by Congress in cutting requests.

There is another, related, line of cases favoring this approach. We have also stated that bilateral contracts should be interpreted, whenever possible, in a manner which will not place one party at the mere will or mercy of the other. *Padbloc Co. v. United States,* 161 Ct.Cl. 369, 376–77 (1963); *Deloro Smelting & Refining Co. v. United States,* 317 F.2d 382, 387, 161 Ct.Cl. 489, 496–97 (1963). Should we adopt defendant's construction, we would, in fact, be subjecting contractors to the "mere will or mercy" of the procuring agency, insofar as the duty to make reasonable budget requests is concerned. *See also C. H. Leavell & Co., supra,* 530 F.2d at 891, 208 Ct.Cl. at 801.

Our refusal in this instance to extend the protective umbrella of the funds available clause to the budgetary actions of the agency works no injustice upon defendant. For some reason unexplained in this record, the Bureau of Reclamation elected not to seek

the financing clearly called for under the construction program. Moreover, the contractor was not warned of the lack of funding until July of 1971, a time when it was, for all practical purposes, too late to remedy the situation. The agency, we must presume, was aware that the budget allotment fell far short of the 1972 fiscal year earnings scheduled under the contract, yet made no effort to obtain a higher appropriation or to notify plaintiff before the start of operations under the contract. This latter possibility was entirely feasible, as construction did not begin until May 1970, when the agency knew that it had approved a higher schedule of earnings than would be appropriated should Congress pass the bill as sent to it by the President. This amount, so far as we can determine, was appropriated without difficulty, Congress doing all that was asked of it in this regard.

Defendant nevertheless urges that a holding for plaintiff would be unfair because the budget request was tendered to Congress before the construction program was approved. Such chronology as is available indicates that plaintiff submitted the construction program on December 22, 1970. The President's budget was sent to Congress on January 29, 1971. The construction program was approved on February 22, 1971. Defendant asserts that the five weeks from submission of the program until the budget was presented to Congress was not enough time to enable the agency to reevaluate its budget and request adequate funds to finance the projected earnings. This contention is supported by *C. H. Leavell, supra,* in which the court recognized that the Corps of Engineers districts prepare individual budgets a full year before the start of any given fiscal year. 530 F.2d at 887–88, 208 Ct.Cl. at 794. Defendant does not actually state that this occurred within the Bureau of Reclamation, although it is easy to believe that the budget preparation process would necessarily begin well in advance of the fiscal year. More to the point, however, is that the court continued, in *Leavell,* to note that thereafter the individual division budget amounts were reviewed and adjusted by the agencies themselves, and then by the Bureau of the Budget, before submission to Congress. This necessarily implies that it is possible to change initial estimates of budgetary needs. Defendant has offered no specific explanation as to why it could not alter the budget request pertaining to plaintiff's project in the five week interim between receipt of the proposed construction program and presentation of the budget to Congress.

We do not need to rest on this point, however. Even assuming that the budget request could not be modified in the five week interim, there is no justification for defendant's subsequent approval of plaintiff's proposed schedule of progress and earnings under the contract, in the face of full knowledge that funds of this magnitude would not be appropriated because not requested. Defendant could have anticipated that approval of the program, without comment, would reasonably lead the contractor to expect that the agency at least was attempting to obtain sufficient appropriations. In this case, the government failed even to notify plaintiff of the wide discrepancy between the funds approved for earnings and the funds which in all likelihood would be available for this purpose, until the beginning of the fiscal year. At this point plaintiff was already to some extent damaged, having undertaken a portion of the construction. Conceivably, given reasonable notice, plaintiff might have revised the program schedule to avoid the exhaustion of funds and losses therefrom.

It seems to us not unreasonable to require either that the agency request the amounts it has approved for earnings under the contract, or, alternatively, to disapprove the construction program or otherwise promptly furnish such information about the flow of funds as the contractor will need to plan its own operations. This is simply part and parcel of the implied duty of cooperation and noninterference which is inherent in any contract. *See, e. g., Lewis-Nicholson, Inc. v. United States,* 550 F.2d 26, 32, 213 Ct.Cl. 192, 204–05 (1977); *Merritt-Chapman & Scott Corp. v. United*

*States,* 429 F.2d 431, 444 n. 23, 192 Ct.Cl. 848, 870 n. 23 (1970); *Hughes Transportation, Inc. v. United States,* 121 F.Supp. 212, 237, 128 Ct.Cl. 221, 261 (1954); *Kehm Corp. v. United States,* 93 F.Supp. 620, 623, 119 Ct.Cl. 454, 469 (1950); *George A. Fuller Co. v. United States,* 69 F.Supp. 409, 411–12, 108 Ct.Cl. 70, 94–96 (1947). *See generally* Speidel, *Implied Duties of Cooperation and the Defense of Sovereign Acts in Government Contracts,* 51 Geo.L.J. 516, 520–22 (1963).

 In short, then, we hold that the protective umbrella of the funds available clause, as worded in this contract, does not extend to an exhaustion of funds occasioned by the agency's decision to request funding grossly inadequate to support the level of earnings approved by the agency for the fiscal year. In order not to be misunderstood, we add at this point we are not holding that under this contract the defendant's executive branch was contractually obligated to request from defendant's legislative branch appropriations adequate to fund continued performance. It may well have been free to decide it would request any level it pleased. We hold only that (a) a contract will not be construed to throw all the cost and loss necessarily incident to such a decision on the contractor, and none of it on the party whose decision caused the loss, unless clauses of the contract require that result without ambiguity, and (b) that a government agency that claims a right to do this is under an implied obligation to assist its contractor, by timely and candid information to take the measures that the latter may deem best to diminish and mitigate its loss.

 Defendant's second argument, which was successful at the Board level, is that the government is not liable because plaintiff itself was instrumental in bringing about the shutdown. The reservation of funds, although inadequate to support a full fiscal year of earnings under the contract, was sufficient to allow earnings to progress as scheduled until January 1972. As it turned out, if plaintiff had followed its own construction program, the shutdown could

have been avoided altogether, as a supplemental appropriation became available early in January 1972.

To illustrate more clearly the gist of defendant's argument, and the Board's decision, the following chart is reprinted from plaintiff's brief:

| | (1) Cumulative Fund Reservations (Exhibit 26) | (2) Cumulative Scheduled Earnings (Exhibit 3) | (3) Cumulative Actual Earnings (Exhibit 26) |
|---|---|---|---|
| 4/71 | $ 500,000 | $ 0 | $ 128,000 |
| 5/71 | 500,000 | 99,000 | 142,000 |
| 6/71 | 500,000 | 116,000 | 345,000 |
| 7/71 | 2,300,000 | 313,000 | 958,000 |
| 8/71 | 2,300,000 | 631,000 | 1,666,000 |
| 9/71 | 2,650,000 | 1,242,000 | 2,362,000 |
| 10/71 | 2,650,000 | 1,658,000 | 2,495,000 |
| 11/71 | 2,650,000 | 2,023,000 | 2,545,000 |
| 12/71 | 2,650,000 | 2,388,000 | 2,545,000 |
| 1/72 | 6,300,000 | 2,799,000 | 2,545,000 |
| 2/72 | 6,300,000 | 3,210,000 | 2,545,000 |
| 3/72 | 6,300,000 | 3,621,000 | 3,224,000 |
| 4/72 | 6,300,000 | 4,032,000 | 4,100,000 |
| 5/72 | 6,300,000 | 4,523,000 | 5,049,000 |
| 6/72 | 6,300,000 | 5,003,000 | 5,785,000 |

It is self-evident from the above chart that earnings under the contract, as scheduled, would have run out in mid-January in the absence of the additional appropriation. It is equally evident that all along plaintiff exceeded the rate of progress called for in the approved construction program. The Board reasoned that plaintiff's own actions rather than the omissions of the government, created the stoppage, because at all times the cumulative fund reservations in fact surpassed cumulative scheduled earnings. Of course, the Board's rationale is only possible because the agency unexpectedly succeeded, in mid-fiscal year, in obtaining a supplemental appropriation, unexpectedly to plaintiff, that is, whether unexpectedly to defendant we do not know. Had this not been the case, even if plaintiff had followed the schedule, the shutdown would simply have occurred a few months later than it did.

The Board held in essence that no equitable adjustment is due Healy because by continuing acceleration plaintiff's plight was of its own making. The Board stated:

Healy's theory of entitlement to an equitable adjustment for a Government-caused change places it in the anomalous position of insisting that the Government should be bound by the approved construction program in all aspects of fund reservations and requests although Healy did not follow its own approved program at any time prior to the shutdown. [76–2 BCA at 56,280.]

The Board has lost sight of the fact that it was the government which initially repudiated and discredited the approved program by choosing not to budget adequate funds to finance the scale of construction called for in the program. The Board itself takes the anomalous position that Healy should be bound by the approved schedule when the government in fact displayed no intent to be bound by it in any way whatsoever.

Plaintiff could not foresee that additional funds would become available in mid-year, and was given only the most pessimistic outlook on this possibility by the agency when inquiry concerning supplemental appropriations was made. The prospect must have looked brighter as time went on, but plaintiff received no modification of the initial "bleak" appraisal. From the standpoint of the information available to plaintiff, a shutdown was inevitable during the fiscal year if the schedule was followed. At this point, it was incumbent upon plaintiff to determine the most feasible approach to accomplishing what construction it could in fiscal year 1972. After evaluating the alternatives, plaintiff decided to continue at the accelerated pace it had set initially and effect the shutdown which was in any case inevitable, before the onset of winter. With the benefit of hindsight, it is now obvious that plaintiff would have done better from defendant's point of view. to have adhered to the original schedule. The merits of this approach were not so apparent in July of 1971, when plaintiff was faced with the decision, which it got no help in making. Under the circumstances, it seems inconsistent, when defendant had forsaken the schedule it approved, to require nonetheless that plaintiff adhere strictly thereto on the dim expectation that the funds available would be supplemented in midyear. Not being aided to make a better informed decision, plaintiff was entitled to modify the approved schedule, and pursue the rate of progress then seeming reasonable in light of the expected level of funds available for earnings, and the apparent inevitability of a stoppage.

Defendant's handling of its financial problems suggests the Byzantine in this instance, with a fine level of economy ostensibly achieved in the regular appropriations with the possibility of a supplemental sternly suppressed until the regular bill is passed but then suddenly emerging into light, and with the contractor expected by defendant to ignore its overt assertions, and intuit the real purpose underlying all. If defendant wants construction contractors who have studied in the school of Machiavelli, it should so state in its invitations for bids.

In short, defendant's conduct would be a breach of contract except for the suspension of work clause, which converts the situation into a constructive suspension compensable by an equitable adjustment under the contract. Accordingly, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. There is, however, some disagreement about the scope of the adjustment. Defendant has raised the question of whether plaintiff, after receipt of notification that additional funds had been reserved, could reasonably prolong the shutdown still further by taking time to repair and modify its equipment. Defendant submits that only four of the seven-odd weeks delay in resuming operations were reasonably necessary to remobilize the work force, and that the additional time taken by plaintiff is not compensable. Under Rule 149 we remand this case to the Board for a determination of the amount of time to which plaintiff was reasonably entitled to resume construction, and for calculation of the amount of the equitable adjustment due plaintiff consistent with this opinion. The attorney of record for plaintiff is designated to advise the court of the status of the Board proceedings at intervals of 90 days, as required by Rule 149(f).