# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Mach I AREP Carlyle Center LLC | ) ASBCA No. 59821 |
| | ) |
| Under Contract No. DACA-31-5-2010-0181 | ) |

APPEARANCES FOR THE APPELLANT:      Terry L. Elling, Esq.
                                    Gregory R. Hallmark, Esq.
                                      Holland & Knight LLP
                                      Tysons Corner, VA

APPEARANCES FOR THE GOVERNMENT:     Thomas H. Gourlay, Jr., Esq.
                                      Engineer Chief Trial Attorney
                                    Richard P. White, Esq.
                                    Michael Shields, Esq.
                                    Jennifer L. McGrath, Esq.
                                      Engineer Trial Attorneys
                                      U.S. Army Engineer District, Baltimore

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

This case involves the earlier-than-anticipated termination of a lease entered by the United States Army Corps of Engineers (the Corps) with appellant Mach I AREP Carlyle Center LLC (Mach I) for office space in the Northern Virginia suburbs of Washington, DC. The lease ostensibly required the Corps to exercise nine separate one-year options after its first year, so long as Congress appropriated sufficient money each year for the lease, and obligated the government to use its "best efforts" to obtain such an appropriation from Congress. In the midst of performance, after imposition of mandatory budget cuts through the "sequester," the government notified Mach I that it was "terminating" the lease at the end of the current option year and subsequently reorganized the portion of the Department of Defense that was acting as a tenant in the subject lease property such that it no longer needed the lease property. The government then paid Mach I the amount of money required by a contract clause that governed lease terminations in the event of lost appropriations. Thus, we are presented with the question of whether this termination and/or the events leading up to it constituted a breach of the lease contract.

The parties elected to proceed without an evidentiary hearing, via Board Rule 11, with each side relying upon the Rule 4 file and its supplements and submitting opening and reply briefs in accordance with an agreed-upon schedule. For the reasons set forth below, we conclude that the terms of the lease requiring the "automatic" exercise of option years are contrary to law and that the government's decision not to exercise the next option was thus not a recoverable breach of contract.

## FINDINGS OF FACT

*I.    The Lease*

On 4 February 2010, the Corps issued a "Solicitation for Offers" to obtain for leasing by the Corps of approximately 22,000 square feet of office space (R4, tab 2 at 1). Carlyle-Lane-CFRI Venture II, L.L.C. (Carlyle-Lane) responded with an offer on 19 February 2010 (R4, tab 3). The government selected Carlyle-Lane for the lease, and the parties executed Contract No. DACA-31-5-2010-0181 (the lease) on 14 June 2010 for the fifth floor of a building in Alexandria, Virginia (R4, tab 4 at 1).

Paragraph 1 of the lease specified that the lease term was one year from the "Commencement Date" (R4, tab 4 at 4). The lease commencement date was, in fact, 1 November 2010[1] (R4, tab 5 at 2). The next provision of the lease, paragraph 2, entitled "GOVERNMENT RELIABILITY AND RENEWAL" envisions nine one-year extension options. We thus quote it in its entirety:

> This lease may be renewed at the option of the Government, for the following period and at the following terms:
>
> This Lease shall be renewed from year to year for a nine (9) year period, provided that adequate appropriations are available from year to year for rental payments which shall be confirmed in writing by the Government to the Landlord nine (9) months in advance of the last day of the current Lease year, and provided further that this Lease shall in no event extend beyond the tenth (10th) anniversary of the initial Commencement Date. In the event that Congress does not appropriate funds for continuance of the mission supported by the subject Lease, the Government's liability shall be limited to the Rental Adjustment amount, shown in Schedule 1 attached hereto, effective in the current Lease year that a Renewal is not exercised. Such Rental Adjustment shall be payable to Landlord four (4) months prior to the last day of the Lease.

(R4, tab 4 at 1-2)

---

[1] The government document cited here actually states "1/1/2010" as the Commencement Date, but, in context, this appears to be a typographical error, given that the end date of the lease is on 31 October 2020 and the contract was only awarded in June 2010 (*see also* R4, tab 12 at 54).

2

Appropriations were addressed in paragraph 9 of the lease, entitled "PROCUREMENT AUTHORITY," which imposed upon the government an obligation to seek funding from Congress and which provides:

> The Government's obligation hereunder is made contingent upon Congress enacting appropriations in support of the mission requiring this leased space. The supplies and services to be obtained by this instrument are authorized by, are for the purpose set forth in, and are chargeable to Procurement Authority Number FW1F3D61G%07610, the available balance of which is sufficient to cover the costs set forth in this Lease.
>
> The Government shall use its best efforts to obtain and maintain all necessary appropriations and related approvals in connection with this Lease.

(R4, tab 4 at 6)

The real estate contracting officer, without contradiction by Mach I, explained in his declaration that the Procurement Authority Number referenced above in paragraph 9 of the lease referred to money available at the time of the execution of the lease for its first year (supp. R4, tab 138 at 2, ¶ 6).

Two more provisions of the contract are particularly important to the dispute here. First, paragraph 3, labeled "TERMINATION," sets forth the government's liability in the event that the lease is terminated due to loss of procurement authority. It provides, in relevant part, that:

> Not withstanding [sic] the rights provided in any other Paragraph, in the event the Government's procurement authority set forth in Paragraph 9 of this Lease is not obtained in any Lease Year other than the first Lease Year, then the Government may terminate this lease within nine (9) months after the procurement authority is denied provided notice is given in writing to the Lessor at least eight (8) months in advance of the intended early Termination date. The Government's liability shall be limited [to] the Rental Consideration owed prior to the Termination date and the Rental Adjustment amount, shown in Schedule 1 attached hereto, effective in the Lease Year the Termination is exercised.

(R4, tab 4 at 2)

3

The lease also includes a form "TENANT ESTOPPEL CERTIFICATE," to be used when necessary (*see* R4, tab 4 at 35), which provides in part that:

> 11. That the Commencement Date of the Lease was
> _____, and this lease shall be automatically renewed
> from year to year without notice unless and until the tenant
> shall give notice of termination in accordance with the lease.
> The lease shall in no event extend beyond _____.

(*Id.* at 36)

On 4 February 2013, at Carlyle-Lane's request, the government executed a tenant estoppel certificate for the use of Mach I, a prospective buyer of the property, in accordance with the form attached to the lease (R4, tab 5). On 14 February 2013, Carlyle-Lane sold the property and the lease to Mach I (app. supp. R4, tabs 43, 45-47). By Supplemental Agreement Number 8, the government acknowledged that the lease was assigned to and assumed by Mach I (R4, tab 6).

## II. Defunding of The Lease by the Department of Defense

The Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240 (2011), set forth mandatory mechanisms for reducing federal spending that were to automatically go into effect on 2 January 2013 unless the Administration and Congress negotiated a different agreement (R4, tab 13 at 3, 5). These automatic cuts, known as "sequestration," were to be in the amount of $1.2 trillion over 10 years and were to fall equally upon defense and non-defense accounts (R4, tab 13 at 3). Although Section 901(c)(1) of the American Taxpayer Relief Act of 2012 (Pub. L. No. 112-240, 126 Stat. 2313 (January 2, 2013)), delayed the onset of sequestration until 1 March 2013, the Administration and Congress failed to come to an agreement upon the budget and, on 1 March 2013, President Obama ordered sequestration into effect (R4, tab 21).

The record reflects no immediate effect of the sequestration order upon the lease. In an undated memorandum, the "Customer Agency"[2] requested that the Corps seek to terminate the lease, effective 31 October 2014 (R4, tab 7). Presumably, subsequent to receiving this undated memorandum, on 28 February 2014, the Corps wrote a letter to Mach I providing "official notification that the Government elects to terminate this lease, effective 31 October 2014" (R4, tab 8). This letter made no mention of lack of appropriations (*id.*).

---

[2] Because of the classified nature of the work performed by the unit occupying the space obtained by the leased, we refer to it as the "Tenant Organization" while we refer to its parent organization as the "Customer Agency" throughout.

4

In the summer of 2014 during option year 3 of the lease, the Corps broke with its prior practice and made no request for funds from the Customer Agency for the lease – presumably because the Corps had already notified Mach I of its intent to end the lease (*see* gov't br. at 6-7, ¶ 25 and citations therein).[3] No funding, in fact, was allocated to the Corps for the lease in the summer of 2014 or any time subsequently (supp. R4, tab 138 at 2).

In a 3 December 2013 memorandum to the Director of the Customer Agency from the Customer Agency's Director of Operations, which cited an 8.5% reduction in funds for the Customer Agency in Fiscal Year 2015 due to sequestration, authority was sought to "disestablish" the Tenant Organization which had ceased operations on 1 October 2013 (supp. R4, tab 128 at 1). On 4 December 2013, this request was formally approved and the Tenant Organization officially ceased to exist (*id.* at 2).

### III. The Dispute

In the meantime, after receiving the 28 February 2014 letter from the Corps terminating the lease, Mach I stated its belief that the termination did not comply with the terms of the lease. On 12 March 2014, representatives of the Corps and Mach I met to discuss the termination letter. (R4, tab 9 at 1) They discussed a rental adjustment amount, pursuant to paragraph 3 (termination) of the lease, and Mach I requested the "back-up documentation" purportedly required by paragraph 3 of the lease (*id.*). By letter dated 27 March 2014, Mach I informed the Corps that it considered the lack of the back-up documentation supporting the lease termination to be non-compliant with the lease's terms, and that Mach I was thus rejecting the Corps' "offer to terminate the Lease" (*id.* at 1-2). Mach I went on to state that it considered the lease to "remain[] in full force and effect" (*id.* at 2).

The Corps responded to Mach I's 27 March 2014 letter with a letter dated 24 April 2014 (R4, tab 10). In this letter, the Corps informed Mach I that it did not consider the lease to require the government to provide "back-up documentation" to support its termination and that obtaining such documentation would be problematic given the classified nature of the Tenant Organization's mission, although the Corps was authorized to inform Mach I that "the mission that occupied the space was terminated as of 31 December 2013 due to cuts in funding as appropriated by Congress to their parent organization. That is, because of funding level cuts, the parent organization terminated...the mission." (*Id.* at 1-2) The Corps also explained that it did not consider its prior termination letter (which it characterized as a "termination notice") to constitute

---

[3] The parties appear to agree with this fact, *i.e.*, that the government made no further attempts to obtain such funding, although the record before the Board never directly proves as much. Given the decision that we make below, there is no need to seek further support for this allegation, which we believe to be most likely true in any event.

5

a "request" to terminate the lease, but, rather, a notification that it *had* terminated the lease (*id.* at 1).

Mach I responded to the Corps with a 21 May 2014 letter sent by its counsel arguing that the Corps was compelled to make its best efforts to obtain funding for the lease and that it had not done so (R4, tab 11). Apparently not having received what it considered to be a satisfactory response from the Corps, on 11 August 2014, Mach I filed a certified claim with the real estate contracting officer (R4, tab 12). The claim alleged that the government had repudiated the lease and that Mach I was entitled to $5,879,487 in damages less $1,138,400 already paid by the government or $4,741,087 (*id.* at 6).

The real estate contracting officer issued a final decision on 12 December 2014 denying Mach I's claim (R4, tab 1). Mach I then filed a timely appeal to the Board.

## DECISION

While the inclusion of a provision requiring the government to use its best efforts to secure funding for the option years of the lease may have represented the parties' effort to enter into a 10-year lease which could have potentially been to the advantage of both parties, any provision for "automatic" renewal is precluded by the longstanding Supreme Court precedent interpreting the Anti-Deficiency Act (ADA), which cannot be evaded by the inclusion of a "best efforts" clause.[4] Thus, the lease cannot be breached by failure to exercise its options, and Mach I's remedies are limited to those set forth in the lease, which have already been paid.

### I. "Automatic" Renewal of the Lease is Precluded by Law

Mach I makes a good argument that, based upon its text, the lease required "automatic" renewal (i.e., exercise of option years) subject to the availability of appropriated funds, which the government was required to use its best efforts to obtain (*see* app. br. at 2, 18-21). This is consistent with the language in paragraph 2 of the lease stating that it "shall" be renewed from year to year so long as funds were available, and the contractually-mandated language in the "Tenant Estoppel Certificate" – which directly stated that, "this lease shall be automatically renewed from year to year without notice unless and until the tenant shall give notice of termination in accordance with the

---

[4] By statute, the General Services Administration (GSA) is given the authority to enter a long-term lease without running afoul of the ADA. *See Springfield Parcel, LLC v. United States*, 124 Fed. Cl. 163, 189-90 (2015) (citing 40 U.S.C. § 585(a)(2)). This authority, however, is limited to the GSA and does not extend to the Corps of Engineers.

6

lease."[5] The termination clause in paragraph 3, moreover, requires the government to give Mach I eight months' notice before "early [t]ermination," which is more consistent with the notion that anything other than continual exercise of the option years constitutes a termination of the contract, rather than a permissive action by the government. Indeed, the notice from the government to Mach I that the lease was ending was referenced as a "termination notice" rather than a simple statement declining to exercise an option.

But for 90 years, the controlling law has forbidden such an agreement, and that law has not changed. In *Leiter v. United States*, 271 U.S. 204 (1926), the Supreme Court concluded, in somewhat similar circumstances to those presented here, that the contemporary version of the ADA,[6] dictated that:

> A lease to the Government for a term of years when entered into under an appropriation available for but one fiscal year, is binding on the Government only in that year. *McCollum v. United States*, 17 Ct. Cl. 92, 104; *Smoot v. United States*, 38 Ct. Cl. 418, 427. And it is plain that to make it binding for any subsequent year, it is necessary, not only that an appropriation be made available for the payment of the rent, but that the Government, by its duly appointed officers, affirmatively continue the lease for such subsequent year; thereby, in effect, by the adoption of the original lease, making a new lease under the authority of such appropriation for the subsequent year.

271 U.S. at 207.

The facts in *Leiter* are illuminating. The government, through the Department of the Treasury, had entered into leases for a period of years that provided for stipulated annual rentals to be paid monthly, although – just like the lease at issue here – the appropriations available at the time that the leases were signed were only sufficient for their first year. *See* 271 U.S. at 205. The leases in *Leiter* provided that the terms of occupancy should extend to 30 June 1925, "'contingent upon' the making available by Congress of appropriations out of which the rent might be paid after the current fiscal year; and that if such appropriation was not made for any fiscal year, the lease should terminate as of [the end of the last fiscal year for which the appropriation was available]." *Id.* After a few years of performance, although appropriations were made for the fiscal year beginning 1 July 1922, the government terminated the leases as of that

---

[5] A completed certificate was issued to Mach I prior to its purchase of the property (R4, tab 5).

[6] Then, section 3679 of the Revised Statutes; now, 31 U.S.C. § 1541(c)(1). The requirements set forth by their operative terms are not materially different for our purposes here.

7

date. *Id.* It was these terminations, notwithstanding the government's promise to continue the leases for an additional three years if it had obtained the appropriations (which it did), that were the subject of the lawsuit against the government in *Leiter. Id.* at 205-06. And the end result was that, notwithstanding the existence of the necessary appropriations, the government was not obligated to renew the leases. *Id.* at 207.

A similar result followed in *Goodyear Tire & Rubber Co. v. United States,* 276 U.S. 287 (1928). *Goodyear* was another case involving the government's agreement to a multi-year lease subject to proper appropriations, and in which the government agency had received the necessary appropriation for the future year before it, nevertheless, terminated the lease. *See* 276 U.S. at 290-91. Relying upon *Leiter,* the Supreme Court determined that the government's action was not a breach of contract and went so far as to permit the government to cancel the lease, hold over for six months, and only be subject to damages for the six month hold-over period, rather than the one-year lease period. *Id.* at 293.

*Leiter* and *Goodyear* remain good law and have not been overruled or questioned.[7] Although *Leiter* is dispositive, Mach I has not meaningfully addressed it or materially distinguished it from the case here. Indeed, Mach I appears to misapprehend the central holding of the case. In its opening brief, Mach I characterizes the holding of *Leiter* as "unremarkable" and standing merely for the proposition that appropriated funds must be available and that a government official "affirmatively continue" a lease over the years for it to be lawful (*see* app. br. at 20-21). Mach I argues that the lease here accomplished these requirements by imposing an affirmative obligation upon the government to renew the lease if the funds were available (*id.*). But, *Leiter* went much further than Mach I recognizes: it precluded the initial contract from imposing upon future government officials a duty to automatically renew the lease, as Mach I claims happened here. Indeed, it would be nonsensical for the Supreme Court to have held (as Mach I argues) that government officials could not contract for a multi-year lease to be renewed automatically in the event that there was sufficient funding, but could contract for the exact same thing by including a term that future government officials

---

[7] We would be remiss, however, if we did not acknowledge a recent case, not cited by appellant, in which the United States Court of Federal Claims (CoFC), has opined that binding options in multi-year contracts might not violate the ADA. *See Northrop Grumman Computing Sys. v. United States,* 93 Fed. Cl. 144, 150 (2010) (citing *RCS Enters. v. United States,* 57 Fed. Cl. 590, 594-95 (2003); *Cray Research v. United States,* 44 Fed. Cl. 327, 332 (1999); and *Solar Turbines Int'l v. United States,* 3 Cl. Ct. 489, 494-95 (1983)). CoFC cases, of course, are not binding upon us and we do not find that *Northrop Grumman* or any of the cases cited therein provide us any reason to depart from the dictates of *Leiter* and *Goodyear.* Moreover, these CoFC cases cited are simply not apposite to the factual circumstances presented here.

would renew the contract every year in the event that there was sufficient funding. The dictates of the law may not be evaded by too clever wordplay.

In its reply brief, Mach I unpersuasively argues that, in *Leiter* and *Goodyear* the federal agencies involved did not have specific statutory leasing authority, unlike the case here, where the Corps has been granted such authority (app. reply br. at 7). This was important, Mach I asserts, because, "[t]he Court's finding that some affirmative action was necessary to renew the leases in those cases was apparently based on the agencies' lack of statutory leasing authority" (*id.*). We read them differently. The rulings were based purely on the ADA. It is telling that Mach I never points to any particular part of the opinions to demonstrate this "apparent" basis. We have reviewed the opinions closely and find no support for this reading.

Mach I also argues, in its reply brief, that the parties' conduct during the first several years of the lease, during which the real estate contracting officer allegedly treated the lease as if it were automatically renewed, somehow demonstrates that the lease should be treated as if it were automatically renewing (app. reply br. at 7-8). If the issue before us were simply one of contract interpretation, this argument might have merit, but the salient consideration here is what contract is permitted by law – and the parties' prior conduct here does not change the meaning and implications of *Leiter* and *Goodyear* in any way.

## II. In the Absence of "Automatic Renewal," the Government's Failure to Renew the Lease is not a Compensable Breach of Contract

The end results of *Leiter* and *Goodyear* make clear that, in the absence of a validly-exercised option, there can be no liability against the government for its failure to continue a lease in future years. Ironically, Mach I recognizes this in the conclusion of its reply brief, in which it presents a quote from Justice Holmes's dissent in *Goodyear*, expressing his displeasure with the results, by which "the United States could accept the contract and repudiate the consequence" (app. reply br. at 15 (quoting 276 U.S. at 293-94)). Although Mach I argues that Justice Holmes's rhetoric demonstrates the perfidy of the government's position (*see* app. reply br. at 15-16), the learned Justice's elucidation of the consequences of the binding majority opinion in *Goodyear* are more to the point here. As Mach I put it, "the Government here seeks to do precisely what Justice Holmes decried" (*id.* at 15). Stripped of its value judgments, that statement by Mach I is more or less accurate, and, critically, it is more or less what the binding decisions in *Goodyear* and *Leiter* allow.

We further note that the existence of the "best efforts" clause here does not helpfully distinguish the case from *Leiter* and *Goodyear*. Even if Mach I were to argue that a breach by the government of the best efforts clause was an independent breach of contract, separate and apart from the government's failure to exercise the options

9

clause,[8] that would advance its cause little: in *Leiter* and *Goodyear*, the agencies already possessed the appropriations that the best efforts clause would have required them to attempt to obtain, but even with the appropriations in hand, their determination not to exercise the options was not an actionable breach of contract. Thus, even if the government had fully complied with the best efforts clause here[9] and had also been successful in obtaining the necessary appropriation, it still possessed an effective veto at the point of option renewal which could not be challenged as a breach of contract, precluding breach of the best efforts clause from being the proximate cause of Mach I's damages.

Accordingly, the lease affords Mach I no remedy for the government's actions that ended in its nonrenewal.[10]

Because of this determination, we need not decide the government's allegation that it complied with the contract or the further defenses that a best efforts clause in a contract signed by the Corps had no authority over the Department of Defense's decision-making or that the doctrine of sovereign acts precludes government liability here.

---

[8] In fact, we read Mach I's argument to be the one more straightforwardly rejected by the Supreme Court in *Leiter* and *Goodyear*, that it breached the contract by failing to renew it without the excuse of lack of appropriated funds (*see* app. br. at 18).

[9] To be clear, we do not decide today whether the government did, in fact, breach the clause. As we demonstrate herein, whether the clause was complied with, was breached, or (as the government suggests, *see, e.g.*, gov't br. at 18-19) was unenforceable, makes no difference to the outcome of this case.

[10] *But see S.A. Healy Co. v. United States*, 576 F.2d 299 (Ct. Cl. 1978), in which the Court of Claims held that, while a "funds available clause" did not impose upon the government a requirement to seek funding from Congress, a contract with such a clause would not be "construed to throw all the cost and loss necessarily incident to such a decision on the contractor...unless clauses of the contract require that result without ambiguity" and that the government was required to take measures to mitigate the losses incurred by lack of funding. 576 F.2d at 307. Neither party cited *Healy*, which is distinguishable factually from the case here by virtue of the type of contract presented, the nature of the losses, and because the lease included the equivalent of a liquidated damages clause, unambiguously setting forth the amount to be paid to Mach I when the lease was not renewed.

## CONCLUSION

By law, no lease can compel the Corps of Engineers to exercise option years that were not yet funded at the time the lease was entered. Accordingly, we grant judgment in favor of the government. The appeal is denied.

Dated: 1 June 2016

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59821, Appeal of Mach I AREP Carlyle Center LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11